**STUYVESANT DREDGING COMPANY, Plaintiff-Appellant,**

v.

**The UNITED STATES, Defendant-Appellee.**

**No. 87-1304.**

United States Court of Appeals, Federal Circuit.

Dec. 10, 1987.

---

Alexander W. Dann, Jr., of Memphis, Tenn., argued for plaintiff-appellant. Of counsel was Robert A. Talley, of Memphis, Tenn.

Carol N. Park–Conroy, of the Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Richard K. Willard, Asst. Atty. Gen., and David M. Cohen, Director.

Before MARKEY, Chief Judge, FRIEDMAN and RICH, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal from a judgment of the United States Claims Court rejecting the appellant's claim for an equitable adjustment of its contract price based upon two claims: that the site conditions it found in performing the contract were different from those stated in the specifications, and that the specifications were defective. The Claims Court rejected both contentions. *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853 (1987). We affirm.

I

A. The principal facts in this case, as found by the Claims Court, are not in dispute. On June 24, 1982, the United States Army Corps of Engineers (Corps), awarded appellant Stuyvesant Dredging Company (Stuyvesant) a contract for maintenance dredging of the Corpus Christi Entrance Channel. Stuyvesant was a new company formed in 1980 to perform government dredging contracts with its new dredge.

Maintenance dredging is done periodically to restore a channel to its so-called "acceptable prism," which is the original shape and size of the channel and always remains the same. Beneath the acceptable prism is an area known as the "prescribed prism." Due to the inaccuracies inherent in the dredging process, material also may be removed from the prescribed prism.

The contract provided for payment based upon the amount of material removed, which could include material from both prisms. Material dredged from outside those two prisms would not be paid for. The contract required an estimated 1,028,000 cubic yards of material to be removed from the acceptable prism of the channel. The channel was 600–700 feet wide and 20,500 feet long. The prescribed prism of the channel contained an estimated 1,970,000 cubic yards of material, which included the 1,028,000 cubic yards in the acceptable prism that were to be removed.

All previous maintenance dredging of this channel had been performed by the Corps with its own dredges. The last maintenance dredging had been done in 1978. After Hurricane Allen, there had been "emergency dredging" in 1981 designed to open the channel to navigation until maintenance dredging could restore the channel to its acceptable prism. Stuyvesant was aware of these previous dredging operations.

Technical provision 4–1.1 of the contract, which (like the other technical provisions)

was part of the invitation for bids, provided:

4–1 CHARACTER OF MATERIALS.

4–1.1 The material to be removed to restore the depths within the limits specified in Construction Technical Provision 1–1., DESCRIPTION OF WORK, is that composing [sic] of shoaling that has occurred since the channel was last dredged, however, some virgin material [earth never before dredged in that particular channel] may be encountered in the prescribed prism, and/or side slope dredging. Bidders are expected to examine the site of the work and the records of previous dredging, which are available in the Galveston District Office, 400 Barracuda Essayon Building, Galveston, Texas 77553 and Corpus Christi Area Office, No. 3 Science Park, Corpus Christi, Texas 78401 and after investigation decide for themselves the character of the materials.

Technical provision 4–1.3 stated:

*In-Situ Densities.* The following table details the results of a nuclear density survey conducted in the project area on 4 April 1979. the [sic] in-place density readings presented represent the average value of the density readings taken within the range indicated. The averaged values should not be interpreted as indicating the maximum or minimum density of material which may be encountered.

The table showed six places in the channel at which readings had been taken and density averages that ranged from 1.380 to 1.675 kilograms per liter.

B. Prior to bidding on the Corpus Christi Channel contract, Stuyvesant had bid on contracts to dredge two other channels: the Sabine–Neches Waterway Outer Bar Channel (Sabine–Neches) and Freeport Harbor Channel (Freeport), both located on the Texas Gulf coast. In preparing bids for those two projects, Stuyvesant reviewed the records in the Corps' offices regarding previous dredgings, removed physical samples of the material to be dredged, and performed echo soundings of the channel bottoms. Stuyvesant was awarded the Freeport contract, which was the company's first dredging contract for the channels of the Texas Gulf coast.

Stuyvesant prepared its bid on the Corpus Christi project while conducting the sea trials and making other preparations for, but before beginning work on, the Freeport contract. The stated purpose of the Corpus Christi contract was to restore the channel to its acceptable prism.

Unlike the other two bids, this time Stuyvesant did not review the records of previous dredgings available in the Corps' offices, and did not visit the site to take material samples or echo soundings. In examining the government's bid documents, Stuyvesant concluded that the wording of the technical provisions in the Corpus Christi project was "very similar, almost identical" to the technical provisions of the Sabine–Neches and Freeport bid documents that it had previously reviewed, and that it was not "warranted to go to the expense of or necessary to do any particular further investigation." Stuyvesant also assumed that the 1981 "emergency dredging" had reestablished the acceptable prism and that it was required to remove only the material deposited since that time. It concluded that the information contained in the Corpus Christi documents therefore was sufficient to enable it to make a bid.

Stuyvesant based its bid on removing approximately 60,000 cubic yards of material a day for 33 days. After the contract was awarded, the Corps returned the contract to Stuyvesant to submit a new work plan based on the 120 days specified in the bid documents. Stuyvesant changed its work plan accordingly, but still intended to complete the project in 33 days.

For the first few weeks of the project, Stuyvesant met or exceeded its plan. Thereafter, the rate of removal fell drastically because Stuyvesant encountered large quantities of material that were difficult to dredge, which had densities of "up to, if not more than, 1.9 kilograms" per liter. Stuyvesant believed that this was material not previously dredged, but the Corps informed it that this was the same type of material the Corps' dredges always had

encountered in that channel. This information was available in the records in the Corps' offices.

The work ultimately required 24 days more than Stuyvesant had anticipated and included approximately 302,500 cubic yards of material taken from the area beyond the prescribed prism, for which the Corps refused to pay.

Although the contract stated that average density readings at fixed places in the channel ranged from 1.380 to 1.675 kilograms per liter, the Corps' records of previous dredgings of the channel showed densities ranging from 1.663 to more than 2.000 kilograms per liter. Density readings alone, however, do not indicate the character of the material, i.e., whether it is fine or coarse sand, or whether it is compacted. Density is only one of the factors that determines the difficulty of dredging shoal materials.

C. After the contracting officer denied Stuyvesant's claim for an equitable adjustment based upon the company's allegedly increased cost of performance, Stuyvesant filed the present suit in the Claims Court pursuant to section 10(a) of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a) (1982). The suit sought a de novo determination of its claim, as that section prescribes. The Claims Court explained that Stuyvesant's claim for an equitable adjustment was "based upon its interpretation of the contract, i.e., that the [dredge] STUYVESANT was only required to remove material that had shoaled following the 1981 emergency dredging, and that the material it removed had shoaled following the 1978 dredging which had compacted into hard and difficult material to dredge." Stuyvesant Dredging Co. v. United States, 11 Cl.Ct. 853, 857 (1987).

Following a trial, the Claims Court rejected Stuyvesant's arguments and dismissed the complaint. In a comprehensive opinion, the court held that Stuyvesant had not encountered a site condition different from that described in the contract because the contract did not indicate or describe the materials, or their characteristics, that Stuyvesant would find within the acceptable or prescribed prisms; that technical provision 4–1 was a performance specification that contained no warranty; that any ambiguity whether the contract language "since the channel was last dredged" referred to the last maintenance dredging in 1978 or to the 1981 emergency dredging, was patent, thereby requiring the contractor to inquire of the government; and in any event, that the meaning of those words was irrelevant to the claim because the time that had elapsed since the last dredging did not affect the difficulty of removing the material from the channel. Stuyvesant Dredging Co., 11 Cl.Ct. at 859–62.

II

A. The pertinent provision of the differing-site-conditions provision of the contract is as follows:

DIFFERING SITE CONDITIONS

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract,.... The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

Stuyvesant contends that it encountered differing site conditions within the meaning of this provision because technical provision 4–1.3 represented that the material to be removed had a density ranging from 1.380 to 1.675 kilograms per liter (which, Stuyvesant asserts, would have been relatively easy to remove and on the basis of which it prepared its bid), whereas in fact the material it removed had significantly higher density and therefore (according to Stuyvesant) was more difficult to remove.

To prevail on a claim for differing site conditions, the contractor must prove, by a preponderance of the evidence, "that the conditions 'indicated' in the contract differ materially from those it encounters during performance." *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States,* 515 F.2d 1116, 1128, 207 Ct.Cl. 84 (1975)). The conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding. *United Contractors v. United States,* 368 F.2d 585, 594, 177 Ct.Cl. 151 (1966). The contractor also must show that it reasonably relied upon its interpretation of the contract and contract-related documents and that it was damaged as a result of the material variation between the expected and the encountered conditions. *Sanders Constr. Co. v. United States,* 618 F.2d 121, 220 Ct.Cl. 639, 641 (1979).

"A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *Maffei,* 732 F.2d at 916 (citing *S.T.G. Constr. Co. v. United States,* 157 Ct.Cl. 409, 414 (1962)). The bid documents or the contract must contain "reasonably plain or positive indications" that subsurface conditions were different from what was actually encountered. *Maffei,* 732 F.2d at 916 (quoting *Pacific–Alaska Contractors, Inc. v. United States,* 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971)).

Technical provision 4–1.3 did not indicate, much less warrant, that the density of the material to be removed from the channel would range from 1.380 to 1.675 kilograms per liter. To the extent that Stuyvesant relied upon that provision as so representing, Stuyvesant's reliance was unreasonable. Moreover, as noted, the density of the material is only one of several factors that determines the difficulty of dredging.

The provision stated that the figures given "represent the average value of the density readings taken within the range indicated[,]" and warned that "[t]he aver-aged values should not be interpreted as indicating the maximum or minimum density of material which may be encountered." By definition, averages are composed of figures both greater and less than the average, so that Stuyvesant must have known that necessarily it would encounter greater densities than the averages. Moreover, the averages were shown for only six specified locations in a channel that was 600–700 feet wide and almost four miles long. They provided a totally inadequate basis for any generalization regarding the character of the material to be removed from the channel.

Moreover, technical provision 4–1.1 stated that "[b]idders are expected to examine the site of the work and the records of previous dredging" that were available at the two designated Corps offices "and after investigation decide for themselves the character of the materials." Such an express instruction to bidders obligated them to perform the necessary investigation to "decide for themselves the character of the materials" "to be removed," and is inconsistent with the notion that Stuyvesant acted reasonably in assuming that the averages indicated the character of the material to be removed. As the Claims Court correctly stated, "[t]he six average density readings were identified to be guides only[,]" and did not "reach the level of estimates and [were] clearly not facts upon which plaintiff could rely." *Stuyvesant,* 11 Cl.Ct. at 859, 861.

The language of these provisions stands in sharp contrast to technical specification 1–1.6, which is captioned "Estimated Quantities." That provision sets forth the "total estimated quantity of material necessary to be removed from the prescribed prism" as 1,970,000 cubic yards, and states that "[t]he quantity of material to be removed from within ... acceptable prism limits ... is estimated to be 1,028,-000 cubic yards." Government estimates are not warranties. *Webco Lumber, Inc. v. United States,* 677 F.2d 860, 863, 230 Ct.Cl. 457 (1982). The technical specifications upon which Stuyvesant relies do not rise even to the level of estimates.

■ Stuyvesant, however, makes the following argument: It notes that it had conducted the tests and documentary examination it was instructed to make in connection with its bids on the two prior dredging contracts. It concluded that the technical specifications for the Corpus Christi Channel were so similar to those for the two other channels that it was justified in assuming that the conditions it would encounter in dredging the Corpus Christi Channel were the same as those to be found in the two other channels. It therefore asserts that it was justified in not making the tests and inquiries the government directed it to make before bidding on the Corpus Christi Channel job.

Each government contract stands by itself, however. Unless the government advises contractors that conditions in different contracts are the same, a contractor acts at its peril if it assumes that what it learned in bidding on other contracts applies equally to a new contract. Here the government gave no indication that the conditions in the Corpus Christi Channel were the same as or similar to those in the other channels. To the contrary, the government explicitly told prospective bidders that they should "examine the site of the work and the records of previous dredging ... and after investigation decide for themselves the character of the materials."

The Claims Court correctly held that "[p]laintiff cannot prove a differing site condition based upon the information in the files of the Corps because it never reviewed that information until the contract was nearly completed, but more importantly the Corps' records accurately reflected the character of the material encountered by other dredges." *Stuyvesant*, 11 Cl.Ct. at 859. As that court correctly stated, where a contractor "has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract." *Id.* (quoting *Vann v. United States*, 420 F.2d 968, 982, 190 Ct.Cl. 546 (1970)).

B. Stuyvesant argues that technical provision 4–1 was a design specification, that the government therefore warranted the correctness of the information contained therein, that the term "shoaling" there used inaccurately described the material to be removed, and that the average densities listed in technical provision 4–1.3 inadequately and erroneously described the character of that material.

■ Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results. *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362, 188 Ct.Cl 684 (1969). Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

■ The Claims Court ruled that technical provision 4–1.3 was not "a detailed [design] type specification for which the government might be liable under the defective specification theory." *Stuyvesant*, 11 Cl.Ct. at 860. Instead it was a " 'performance' type specification for which the government does not warrant accuracy or adequacy." *Id.*

That determination was correct. Technical provision 4–1 did not instruct Stuyvesant how it should perform the dredging of the channel. It merely stated the result to be achieved, namely, that the channel was to be dredged to its acceptable prism. Stuyvesant had complete discretion to determine how it would perform that work. Its only obligation was to accomplish the designated result.

■ C. Stuyvesant also makes an argument based upon the statement in technical provision 4–1.1 that the "material to be removed ... is that compos[ed] of shoaling that has occurred since the channel was last dredged." Stating that it knew that the channel was last dredged in 1981, Stuyvesant contends that this provision led it to believe that the contract required the removal of only the material added to the channel since that time, which it assumed was a small amount and easy to dredge.

The government counters that the words "last dredged" refer to the last maintenance dredging in 1978 and not to the emergency dredging three years later.

We find it unnecessary to determine which interpretation of the contract is correct or whether any ambiguity in the language was "patent" (as the Claims Court held), which would have required the contractor to make inquiry of the government before bidding, or merely latent (as Stuyvesant contends), in which case the contractual language would be construed against the government as the drafter of the document. For even under Stuyvesant's interpretation of the contract, Stuyvesant does not prevail.

It is unclear whether Stuyvesant's argument is that the differing-site-conditions clause applies or that the specifications were defective, or both. The argument that Stuyvesant encountered different site conditions is that technical provision 4–1.1 represented that Stuyvesant would be required to remove only shoal deposits that were made since 1981, whereas in fact it had to remove the greater and denser shoal that had been deposited since 1978. The defective specification contention is that technical provision 4–1.1 made the same misrepresentation.

The short answer to either branch of the argument is that it was immaterial to Stuyvesant's claim whether the shoaling it had to remove had been deposited since the 1978 dredging or only since the 1981 dredging. The Claims Court found:

> Expert testimony taken at trial has persuaded this court that there is no difference in the degree of difficulty of dredging shoaling whether it has been in place for a year (the 1981 dredging) or for four years (the 1978 dredging). The court finds that it is a widely accepted principle of soil mechanics and material consolidation that the density of granular materials changes very little with time once they are deposited, whereas the density of fine grain materials, such as silts and clay, does increase with time, which makes it correspondingly more difficult to dredge. However, the period of time required for a significant increase in density is very long, perhaps many years or decades.

*Stuyvesant,* 11 Cl.Ct. at 858.

These findings are not clearly erroneous, and they compel rejection of Stuyvesant's arguments. Any unanticipated work that Stuyvesant was required to do in performing the contract did not result from the fact that it was required to remove shoaling that may have been deposited since the 1978 dredging of the channel.

## CONCLUSION

The judgment of the United States Claims Court dismissing the complaint is

AFFIRMED.