923 F.2d 871
 37 Cont.Cas.Fed. (CCH) 76,063
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
R.J. CROWLEY, INC., Appellant,
v.
The UNITED STATES, Appellee.
 No. 90-1150.
 United States Court of Appeals, Federal Circuit.
 Dec. 12, 1990.
 
 Before ARCHER, MICHEL and CLEVENGER, Circuit Judges.
 DECISION
 CLEVENGER, Circuit Judge.
 
 
 1
 R.J. Crowley, Inc. (Crowley) appeals from a final decision of the Armed Services Board of Contract Appeals (Board), ASBCA No. 34872, denying its claim for an equitable adjustment for insulation installed during performance of Contract DACA31-86-C-0115. Only the issue of entitlement was before the Board. We reverse and remand.
 
 OPINION
 
 2
 Crowley was awarded a contract to install roofing and repair exterior walls on two government buildings. Crowley's bid incorporated a subcontractor's bid for roofing and insulation.
 
 
 3
 R-values and U-values are conventional terms used in the roofing trade to measure insulating capacity. Every material, including air, has a characteristic R-value that measures resistance to the transmission of heat. Higher R-values indicate greater insulating value. The reciprocal of the resistance, 1/R, is the U-value. The U-value is the overall coefficient of thermal transmittance and is generally expressed as a rate of heat flow over a period of time.
 
 
 4
 The contract specifications provide that the "[a]ctual installed thickness of insulation shall be such as to provide a coefficient of heat transmission or U-value, through completed roof construction air-to-air, not in excess of .030 Btu per hour." The written specifications further provide that "[i]nsulation shall be laid in two or more layers."
 
 
 5
 Plate 6 of the drawings contain the following block labelled "Typical for Roofs--Sections 1, 2 and 3":
 
 
 6
 TABLE OF COEFFICIENT FOR NEW ROOFING
DESCRIPTION RVALUE
------------------------------ -------
 Outside air film .17
 Isocyanurate Insulation 31.25
 7" Concrete Slab .77
 Air Space .97
 3/4 " Metal Lath & Plaster .47
 Inside Air Film .61
 -------
 Total Resistance = 34.24
 Total U Value 1/R = .029
 
 
 7
 Three wall sections are depicted on this plate. In each section, two layers of insulation are drawn above an existing concrete deck. An arrow pointing to the two layers is labelled "New Roof Insulation W/R-value min. 12.5." Plate 7 of the drawings also contains an identical notation joined by a single arrow to two layers of insulation. The subcontractor interpreted the drawings as requiring a minimum of two layers of insulation which together would provide an R-value of at least 12.5.
 
 
 8
 Crowley recognized that use of insulation with a total R-value of 12.5 would not meet the specified U-value of .030. However, the specifications permitted achievement of the required U-value "through completed roof construction air-to-air." The subcontractor believed that existing insulation, generally present "in the 3/4 inch metal lath and plaster under a suspended ceiling," would make up the difference in U-value and would have been known to the architect or engineer that prepared the drawings for the Government. In a post-award communication with the Government, the subcontractor referred to "[c]eiling insulation or other varying inside conditions assumed to be existing." Thereafter, the Government informed Crowley that each of the two layers of insulation must provide a minimum R-value of 12.5, or twice what Crowley believed. The Government acknowledged that even with two layers of insulation, each with an R-value of 12.5, the specified U-value of .030 would not be met without additional contribution from some other unknown element.
 
 
 9
 The subcontractor installed two layers of insulation with a combined R-value of 30.96. Crowley submitted a claim for the additional cost of $89,667.09. The contracting officer failed to issue a timely final decision and Crowley appealed to the Board pursuant to Section 6(c)(5) of the Contract Disputes Act. 41 U.S.C. Sec. 605(c)(5) (1988).
 
 I. The Board's Decision
 
 10
 Crowley's claim and the Government's response were presented to the Board on documents with affidavits, pursuant to Board Rule 11.
 
 
 11
 The Board denied Crowley's claim on the ground that the contract was patently ambiguous and that Crowley had failed to satisfy its duty to inquire.
 
 
 12
 In its opinion, the Board did not lay out a basis for its conclusion "that the ambiguity created by the drawings and specifications was a patent one about which the appellant had the duty to inquire." Notwithstanding an express holding that Crowley's interpretation of the contract was reasonable, the Board merely stated that because the additional contribution that Crowley assumed to exist "was more than 50 percent of the total amount required, [it] was, in our opinion sufficient to create a duty upon appellant to inquire whether its assumption was correct that it was all due to other conditions." In its reconsideration, the Board again stated "appellant's interpretation of the contract was reasonable that the drawings indicated a total R-value of both layers of insulation together. However ... because of the large discrepancy which then existed to meet the contract requirements, there was a patent discrepancy about which appellant should have inquired."
 
 II. Standard Of Review
 On appeal, the decision of the Board
 
 13
 on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.
 
 
 14
 41 U.S.C. Sec. 609(b) (1988).
 
 
 15
 The Board's conclusions regarding both the existence of a patent ambiguity and the reasonableness of Crowley's interpretation are legal conclusions that we review de novo. Newsom v. United States, 676 F.2d 647, 649 (Ct.Cl.1982) (existence of patent ambiguity in contract must be decided de novo by the court); Mountain Home Contractors v. United States, 425 F.2d 1260, 1264-65 (Ct.Cl.1970) (reasonableness of contractor's interpretation decided as a question of law).
 
 III. Existence Of Patent Ambiguity
 
 16
 The issue before us is whether an ambiguity created by the drawings and specifications was so glaringly obvious that Crowley had a duty to seek clarification prior to bidding.
 
 
 17
 What constitutes a patent ambiguity "cannot be defined generally, but on an ad hoc basis of looking to what a reasonable man would find to be patent and glaring." Max Drill, Inc. v. United States, 427 F.2d 1233, 1244 (Ct.Cl.1970). A patent ambiguity is one that blatantly jumps out at the reader, as where a direct numerical conflict exists or where the contract contains an obvious internal inconsistency. Newsom, 676 F.2d at 650-51 (contractor held to duty of inquiry because a "substantial, obvious conflict" existed in a contract where drawings required work on fewer floors than did the specifications); S.O.G. of Ark. v. United States, 546 F.2d 367, 370 (Ct.Cl.1976) (patent ambiguity found where contractor "should have recognized at once that there would be a grave problem" created by an internal inconsistency that "was not subtle, hidden or minor but patent, blatant, and significant"); Chris Berg, Inc. v. United States, 455 F.2d 1037, 1045 (Ct.Cl.1972) (contractor held to duty of inquiry where "obvious contract inconsistency" required application of cement-latex filler coat "to either the entire hospital exterior ... or only to repaired, unpainted surfaces").
 
 
 18
 The Board did not point to any blatant collision between the drawings and specifications in the contract. Instead, it concluded that the extent to which Crowley relied on the existing conditions to satisfy the required U-value created a "large discrepancy" in the contract. That large discrepancy was deemed proof by the Board of a patent ambiguity, and since Crowley had not tested its interpretation of the contract by inquiry before bidding, the Board rejected Crowley's claim for an equitable adjustment.
 
 
 19
 While the "large discrepancy" might bear on the reasonableness of Crowley's interpretation, it does not itself constitute a patent ambiguity. Examining the contract as a whole, we find no two parts in glaring contradiction: the specifications require a certain "air-to-air" U-value and the drawings contain a notation "New Roof Insulation W/R-value min. 12.5." Because, by both parties' estimation, the "air-to-air" U-value includes some undefined amount of additional contribution from pre-existing conditions, the U-value does not stand in glaring contradiction to the minimum R-value requirement for the new insulation alone.
 
 
 20
 We turn now to a consideration of whether the notation in the drawings created a patent ambiguity with the Table of Coefficients. In the Table, isocyanurate insulation is assigned an R-value of 31.25. After reviewing the contract and the record, we conclude that the table is included as a sample to demonstrate how the U-value is calculated. The Table does not establish any limitation on the materials required by the contract. But the notation on the drawings, "New Insulation W/R-value min. 12.5," appeared in three sections in Plate 6 as well as in Plate 7, and could be nothing but a materials limitation. If there is any ambiguity existing between the drawing notation and the Table, it is not so glaringly obvious as to impose a duty of inquiry on Crowley.
 
 
 21
 Finally, we consider whether in any of the plate sections, the position of the single arrow, drawn from the notation "New Roof Insulation W/R-value min. 12.5" towards two layers of insulation, itself created a patent ambiguity. In support of its interpretation of the contract, as well as its post-award order for insulation with an R-value of 12.5 per layer, the Government contends that each arrow points to a particular layer of insulation. After examining Plate 6 and Plate 7, we do not agree. Furthermore, we read the notation "New Roof Insulation" to indicate new insulation in its entirety and not per layer. If the Government meant for the notation to apply to each layer, it should have so stated in words or so indicated by using double arrows. We hold that the positioning of the single arrows created no patent ambiguity in the contract.
 
 
 22
 IV. Reasonableness Of Crowley's Interpretation Of The Contract
 
 
 23
 Where the court finds that a patent ambiguity did not exist, then the reasonableness of the contractor's interpretation determines whether the normal contra proferentem rule applies. Newsom, 676 F.2d at 650 n. 11. Our task here in that regard is simple. The Board concluded that Crowley's interpretation of the contract was reasonable. We see no reason to disturb that conclusion.
 
 
 24
 The specification requiring insulation "such as to provide" a U-value for the completed roof not in excess of .030 can be considered a performance specification. That much, however, does not end the case. If this were a pure performance contract, Crowley would have had "complete discretion to determine how it would perform that work." Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed.Cir.1987). Moreover, it has long been the law that performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective." Simmons v. United States, 412 F.2d 1360, 1362 (Ct.Cl.1969).
 
 
 25
 In this case, Crowley hardly had unfettered discretion to select any means it wished to accomplish the single performance specification. Instead, Crowley's choices with regard to the installation of the insulation were quite restricted. The contract stated that the insulation "shall be laid in two or more layers" and that it "shall be laid in parallel courses." The contract required that "end joints shall be staggered" and "[i]nsulation thickness shall be uniform over common roof areas." Even the details for handling the insulation during installation were meticulously specified as mandatory in the contract. Moreover, Crowley was directed to comply with the Government's interpretation of the design specification in the drawings. The Government never suggested the need for Crowley to pass the contract's performance test for the insulation, which required a U-value "not in excess of .030 Btu per hour, per square foot, per degree F. temperature difference, when determined for winter conditions in accordance with recognized methods in agreement with ASHRAF Handbook, Fundamentals." In this case, satisfactory performance was controlled by the design specifications of the contract, and satisfaction of the terms of the contract cannot, and was never intended to, be tested solely on the basis of whether the stated performance standard was met.
 
 
 26
 Furthermore, we disagree with the dissent's characterization of Stuyvesant Dredging, supra, as standing for the proposition that Crowley was required to show that all significant options to achieve the performance requirements were foreclosed by the design specifications in order to rely on a theory of implied warranty. That case is not relevant to the proper outcome here. "Stuyvesant had complete discretion to determine how it would perform [the] work," 834 F.2d at 1582; Crowley did not. Stuyvesant's "only obligation was to accomplish the designated result," id., in a contract held by this Court to be a pure performance contract. We have before us, on the contrary, a mixed contract. Our precedent establishes that when a contract contains a mix of both design and performance specifications, the contractor may defend on an implied warranty theory if the design specifications are defective to the degree that adherence to them results in an article that fails to satisfy a stated performance specification. R.E.D.M. Corp. v. United States, 428 F.2d 1304, 1310 (Ct.Cl.1970) (performance specification requiring testing of fuze assembly at a centrifugal force up to 2,500 G's did not negate contractor's right to assume that if the detailed design instructions were followed, a satisfactory product would result); Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634 (Ct.Cl.1966) (contractor that attempted to meet performance specification by following the Government's originally defective design specifications was entitled to recover).
 
 V. Conclusion
 
 27
 Since the contract was not patently ambiguous, no duty of inquiry can be imposed on Crowley. Crowley reasonably interpreted the contract as requiring installation of two layers of insulation with a combined R-value of at least 12.5. Having installed additional insulation to satisfy the Government's post-award order, Crowley is entitled to an equitable adjustment.
 
 
 28
 Accordingly, we reverse the judgment of the Board denying Crowley's claim and remand for further proceedings implementing our decision.
 
 VI. Costs
 
 29
 The Government shall bear costs.
 
 
 30
 MICHEL, Circuit Judge, dissenting.
 
 
 31
 I respectfully dissent because the majority effectively nullifies a contract requirement that seems to me clear, independent and essential. While I agree with the Board's result denying Crowley an equitable adjustment for the cost of additional insulation, I believe its, as well as the majority's, analysis is misdirected. The true issue is not whether there was a patent ambiguity, but whether there was an unmet "performance specification" that precludes Crowley's recovery. This issue was fairly presented to the Board, although not mentioned in the Board's opinion.
 
 
 32
 Clearly, this contract contained a mix of design and performance specifications. Two specifications expressly required Crowley to install insulation "such as to provide" a U-value (heat loss) for the roof not in excess of .030 and to submit for advance approval the computations used for determining the thickness of the insulation that needed to be installed. See Joint Appendix, Crowley v. United States, No. 90-1105, at 23-24 (Fed.Cir. filed May 29, 1990) [hereafter Jt.App.] (Specifications 6 & 3). This U-value requirement was a performance specification. On its face, it required that, however Crowley chose to do so, it must add sufficient insulation to meet the stated U-value.
 
 
 33
 That the contract also contained two design specifications that somewhat restricted Crowley's options on how to do so did not eliminate the performance specification. The first required "two or more layers" and the second that the two layers shown in the drawing provide a minimum R-value of 12.5 (apparently to prevent leakage of heat at the seams), Jt.App. at 25, 107. These design specifications did not render moot, superfluous or impossible achievement of the separate performance specification. Nor were the design specifications inconsistent with the performance specification, forcing the contractor to choose between them. Thus, in my view, neither type of specification trumps the other; both must be met.
 
 
 34
 That the second of the design specifications was ambiguous does not overcome the performance specification, either. Regardless of whether the specification of 12.5 minimum R-value referred to each of the two layers shown, as the government contends, or, as Crowley contends, to both, the separately-mandated U-value still could, and had to, be achieved. Thus, under either interpretation, enough insulation still had to be installed to achieve the U-value specified. Otherwise, contract compliance failed.
 
 
 35
 It is undisputed that the government did not approve Crowley's original calculation calling for installation of only 12.5 R-value insulation. Instead, an authorized representative of the contracting officer directed Crowley "to proceed with the procurement and installation of the insulation to acquire a U-value of the roof construction, air to air, not to exceed .03 as outlined in ... paragraph 6 of the contract specifications." Id. at 56. At the government's insistence, Crowley ultimately installed insulation of an R-value of 30.*
 
 
 36
 In my view, only if Crowley could show that all significant options were foreclosed by the design specifications could it rely on "an implied warranty that if they are followed, an acceptable result will be produced." Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed.Cir.1987). Although the court did not so state, I read Stuyvesant as necessarily implying that if a contract contains a performance specification that is independent of the design specifications, then the contractor is not relieved of the performance requirement.
 
 
 37
 The majority reverses the Board's decision, apparently concluding that the contract as a whole is for design, not performance. Logically, however, the analysis must consider each specification, rather than merely categorize the contract as primarily of the design or performance type. See id. When this contract is so analyzed, an independent performance specification remains. Because Crowley has not shown that the design specifications overcame the performance specification, the responsibility for the added cost rested with Crowley. Hence, it is not entitled to an equitable adjustment. Therefore, while I would affirm the Board's result, I would do so on the grounds explained above.
 
 
 
 *
 It is immaterial whether this fully met the U-value of .030, because of the R-value of the existing roof, as the government can always waive part of the required performance. In any event, the issue for decision on appeal is not whether the government got exactly the roof it bargained for, but whether Crowley must absorb the cost of the insulation the government, per the express contract requirement, ultimately required it to install