NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**UNITED STATES ARMY CORPS OF ENGINEERS,**
*Appellant*

**v.**

**JOHN C. GRIMBERG CO., INC.,**
*Appellee*

---

2019-1608

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 58791, 59167, 59168, 59169, 59170, 59171, 59717, Administrative Judge J. Reid Prouty, Administrative Judge Richard Shackleford, Administrative Judge Robert T. Peacock.

---

Decided:  June 9, 2020

---

ALBERT S. IAROSSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellant.  Also represented by JOSEPH H. HUNT, ALLISON KIDD-MILLER, ROBERT EDWARD KIRSCHMAN, JR.; SCOTT SEUFERT, United States Army Corps of Engineers, Baltimore, MD.

HERMAN MARTIN BRAUDE, Braude Law Group, P.C.,

Rockville, MD, argued for appellee.  Also represented by EDWARD JEROME PARROTT, Watt, Tieder, Hoffar & Fitzgerald, McLean, VA.

———————————

Before O'MALLEY, WALLACH, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge*.

The United States Army Corps of Engineers ("Corps") appeals a decision of the Armed Services Board of Contract Appeals ("Board") holding that John C. Grimberg Co., Inc. ("Grimberg") is entitled to an equitable adjustment to the contract price for construction of the Navy Medical Biological Defense Research Laboratory ("Biolab") in Fort Detrick, Maryland. *John C. Grimberg Co.*, ASBCA Nos. 58791, 59167, 59168, 59169, 59170, 59171, 59717, 18-1 BCA ¶ 37,191.  While we understand the Board's desire to reach a conclusion it felt was not unjust in the circumstances, for the reasons discussed below, we must *reverse*.

## I. BACKGROUND

The Corps issued a Request for Proposal ("RFP") on February 23, 2009, seeking offers for the design and construction of the Biolab.  The project entailed construction of a large laboratory building, an entry point building, parking facilities, an access road, stormwater management, and perimeter fencing.  The RFP incorporated by reference the standard differing site condition ("DSC") clause, as prescribed by 48 C.F.R. § 52.236-2, pursuant to which a contractor can ask for a cost adjustment if subsurface conditions at the construction site "differ materially from those indicated in the contract."

The RFP also  included, as an appendix, the "Geotechnical Report and Requirements" ("Geotechnical Report"). J.A. 4248–4423.  The Geotechnical Report, although "preliminary" was meant to provide "bidders with sufficient

information to identify the general subsurface conditions of the site." J.A. 4249. The Geotechnical Report stated that the Biolab should be supported by a deep foundation system of drilled piers (i.e., caissons or shafts) socketed into five feet of competent rock. J.A. 4256. The portion of the pier embedded in rock is called a "rock socket."

To assist contractors in developing bids for the Biolab's foundation, the Geotechnical Report disclosed 46 test borings to indicate the subsurface conditions at the project location. Eleven of the borings came from an investigation done during the construction of the National Interagency Bio-Defense Campus, of which the Biolab is a part. Just two of those borings, DH-11 and DH-12, were located within the planned footprint for the Biolab. Those two borings indicated high quality rock, with no intervening incompetent rock. The Geotechnical Report indicated, however, that contractors should not assume that the rock at the site would be free of voids given the information available from other borings. For example, certain borings taken between 300 and 500 feet from the Biolab footprint, in preparation for a different construction project, showed between 0 and 20 feet of incompetent rock.

Notably, the bedrock below the Biolab project, like the surrounding area, is limestone in a Karst formation. Karst geology is a condition of limestone rock that occurs when portions of the rock have been degraded over time by a Karst solutioning process. This process can create large cracks, fissures, and voids in the rock. As the Board explained, "Karst is a recognized geohazard, '[k]nown for its variability and its degree of inconsistency, both vertically and horizontally over extremely short distances.'" J.A. 2.

In response to the Corps' RFP, Grimberg submitted a proposal on March 31, 2009. Grimberg estimated that it would need to drill through 240 feet of rock (exactly 5 feet for each of 48 piers), at between $270 and $530 per foot, depending on the depth of the pier. This quote relied on

the testing results from DH-11 and DH-12, and assumed that excavation of incompetent rock would not be required as part of the construction.

On May 29, 2009, the Corps awarded the Biolab Project Contract to Grimberg. Grimberg proceeded on the contract and, once it began work on the foundation, quickly began to encounter incompetent rock. On March 10, 2010, Grimberg notified the Corps that it was encountering, in its view, a DSC. Grimberg ultimately drilled through 923 feet of rock—683 feet more than it had accounted for in its bid. J.A. 3435.

In May 2012, once the Biolab project was complete, Grimberg submitted a request for equitable adjustment of the contract price to the Corps, alleging a Type I DSC. J.A. 3449–3452. The request acknowledged that Grimberg relied on only DH-11 and DH-12 when structuring its bid. J.A. 3450. The letter further stated that Grimberg drilled through an average of 13.6 feet more rock per pier than expected to create the necessary rock sockets. J.A. 3451. The Corps denied Grimberg's request in June 2012. In December, Grimberg submitted a certified claim. The Corps again denied the claim and Grimberg appealed to the Board.

The Board conducted an eight-day hearing and issued a lengthy opinion. Relevant to this appeal, the Board found that Grimberg encountered a Type I DSC. The Board explained that Grimberg met the standard for a Type I DSC because "[t]he quantities of rock encountered greatly exceeded the quantity reasonably foreseeable based on a fair reading of contractual indications." J.A. 28. The Board found that Grimberg's reliance on just two borings, DH-11 and DH-12, was unreasonable. J.A. 28–29; *see also* J.A. 31 ("Confronted with the plethora of cautionary contractual indications, 'cherry picking' a subset of 2 of 46 borings, regardless of their proximity to the Biolab foundation, was unjustifiable in the circumstances of this case."). The

Board explained, however, that Grimberg's reliance on two borings was more reasonable than the government's proposal that Grimberg should have relied on borings located 300 to 500 feet from the Biolab footprint.  J.A. 29.  The Board explained:

> a primary reason for our conclusion that [Grimberg] is entitled to relief despite its misreliance solely on DH-11 and DH-12, is the gross disparity between the quantities of incompetent rock actually encountered and the quantity that we consider was reasonably indicated in the contract's Geotechnical Report.  Even if it had expanded its pre-proposal analyses to include the seven most proximate borings to the Biolab site . . .  or devoted the time and effort to analyze the 26 [other] borings as did the Corps at trial, the disparity was material and not reasonably foreseeable.

J.A. 29.

Having found that neither the Corps nor Grimberg provided a reasonable estimate of the amount of rock a reasonable contractor would have expected, the Board engaged in a "jury verdict" type analysis.  J.A. 30.  Based on the expert testimony and evidence presented at trial,  it concluded that the contract reasonably indicated that 360 feet of rock drilling (an additional 2.5 feet per pier) would be required.  *Id.*  Because Grimberg actually encountered on average an additional 13.6 feet of incompetent rock, the Board found that Grimberg encountered more rock than was reasonably indicated in the contract.  *Id.*  Thus, the Board found for Grimberg on its DSC claim.  The Board further found in favor of Grimberg on a claim for delays related to the DSC.  J.A. 49.

The Corps filed a motion for reconsideration.  In denying the motion, the Board explained that "[a]n 'all or nothing' resolution of this case would have been overly legalistic and unjust."  J.A. 70.

## II. DISCUSSION

In an appeal from the Board, we review questions of law de novo. *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335 (Fed. Cir. 2013). The interpretation of contracts, statutes, and regulations is a question of law. *Id.* We review the Board's factual findings to determine if the findings are arbitrary, capricious, or not supported by substantial evidence. *Id.*; 41 U.S.C. § 7107(b).

A Type I DSC exists when "subsurface or latent physical conditions at the site . . . differ materially from those indicated in [the] contract." 48 C.F.R. § 52.236-2(a)(1). To establish an equitable adjustment to contract price based on a Type I DSC, a contractor must prove by a preponderance of the evidence:

> [1] the conditions indicated in the contract differ materially from those actually encountered during performance; [2] the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; [3] the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and [4] the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002); *see also Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987). "While a contractor need not demonstrate that its interpretation of the contract is the *only* reasonable one, it does bear the burden of showing that its construction is at least a reasonable reading." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 917 (Fed. Cir. 1984) (emphasis in original).

The Corps argues that the Board erred when it held that Grimberg is entitled to an equitable adjustment to

contract price despite having repeatedly stated that Grimberg's interpretation of the contract was unreasonable. Grimberg does not respond to this contention. In fact, Grimberg fails to even address the governing legal standard in its briefing. Grimberg's failure to contend with the required legal test is fatal to its claim.

For over thirty years, we have required that, to receive an equitable adjustment to the contract price, a contractor must prove that it reasonably relied on its interpretation of the contract. *See Stuyvesant Dredging*, 834 F.2d at 1581. Here, the Board found that Grimberg failed to do just that. *See* J.A. 28–29, 31. We are thus left with the inescapable conclusion that Grimberg has failed to prove its entitlement to an adjustment. The Board erred as a matter of law when it concluded otherwise.

The Board's finding that the Corps' interpretation was less reasonable than Grimberg's does not change our conclusion. Appellee's Br. 60–64. Despite the moniker "equitable adjustment" employed in this context, our case law does not permit us to balance the Corp's reasonableness against that of the contractor. The focus of our inquiry must be on the reasonableness of the contractor. This focus serves the purpose of incentivizing contractors to carefully and reasonably interpret contract documents. *See H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed. Cir. 1998). In this case, the Corps chose to propose what it viewed as a "reasonable" interpretation of the contract to contrast with the "reasonable" interpretation proposed by Grimberg. That both the Corps and Grimberg failed in their endeavor to establish what would have been reasonable for this particular contract does not somehow shift the burden of providing a reasonable interpretation from Grimberg to the Corps. Regardless of the Corps' understanding of the contract, our case law is clear that Grimberg must bear the risk of bidding on a contract without reasonably interpreting what that contract discloses.

The Board found more than once that Grimberg failed to prove that it reasonably relied on the test results from just two borings when formulating its Biolab bid.[1] Because Grimberg was unreasonable, under long-established law, it is not entitled to an equitable adjustment of the contract price.

## III. CONCLUSION

For the reasons discussed above, we reverse the Board's holding that Grimberg is entitled to an equitable adjustment to contract price based on a Type I DSC.

**REVERSED**

---

[1]     While Grimberg dedicates a significant portion of its brief to summarizing the evidence it presented to the Board, *see* Appellee's Br. 18–50, Grimberg does not directly challenge the Board's finding that Grimberg's interpretation of the contract was unreasonable, *see id.* at 58 (arguing that the Board's interpretation of the contract was reasonable), 60 (arguing that the Board correctly rejected the Government's interpretation of the contract as less reasonable than Grimberg's).  To the extent Grimberg challenges the Board's factual finding that reliance on two borings was unreasonable, substantial evidence supports that finding.