**JOHN MASSMAN CONTRACTING CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 564–88C.

United States Claims Court.

April 26, 1991.

R.W. Miller, Kansas City, Mo., for plaintiff.

Stephen J. Gillingham, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for summary judgment. For the reasons discussed below, the court grants defendant's motion.

## FACTS

On July 21, 1983, defendant, acting through the U.S. Army Corps of Engineers (Corps), awarded a firm, fixed-price contract to plaintiff, John Massman Contracting Company, for scour protection work at Lock and Dam No. 10, located on the Mississippi River near Guttenberg, Iowa. Plaintiff previously had performed scour protection work at Lock and Dam No. 5 of the same project. Scour protection involves the underwater placement of stone, in appropriate locations, to combat the erosive effect of water flow moving down the river and through the lock and dam. This permits the Corps to exercise some degree of control over river flow, by opening and closing gates in the dam wall, in order to maintain adequate water levels for navigation and environmental purposes. River flow, measured in cubic feet per second (cfs), is subject to wide and frequent variations, primarily and directly influenced by weather conditions, *e.g.*, rain and ground/snow melt. The contract specified a performance period of 200 calendar days. The original contract completion date was February 27, 1984, however, defendant issued fourteen modifications, seven of which consisted of time extensions. As a result, the contract period was extended to 1,311 days, with a final contract completion date of September 30, 1987.

Plaintiff began work on September 9, 1983 and continued until December 9, 1983 when the winter season required a shut-down of operations. Special provision 1A–8.2 in the contract specified that plaintiff would not be permitted to work during the winter months when navigation was closed because of river freezing. Tables attached to the contract indicated previous closing dates of the navigation seasons from 1950 to 1982, typically December through March, although the dates varied from year to year depending on the weather. Other tables included in the contract documents stated guidelines established by the Corps that governed, based on river flow, the number of dam gates that could be closed simultaneously. Contract provision 1A–8.1 stated that the number of gates that could be closed at a time was limited, but that the Corps would close as many gates as possi-ble, in accordance with its guidelines, to facilitate plaintiff's scour protection work. The contract documents did not identify the flow volumes at which scour protection work could be performed efficiently, nor did they specify the number of gate clo-sures required for performance of the work. Instead, the contract noted that these tables, along with a third table indi-cating the approximate average monthly flow for Lock and Dam No. 10, were to be used by the contractor only as guides for scheduling operations.

On November 29, 1983, the contracting officer's authorized representative sent a notice to plaintiff that it was behind sched-ule, and requested a revised project comple-tion schedule. The letter also stated that if the contractor felt it was behind schedule due to unusually high river flows, it could request a time extension under General Provision 5(d) of the contract titled TERMI-NATION FOR DEFAULT—DAMAGES FOR DELAY—TIME EXTENSIONS (DAR 7–602.5). On December 6, 1983, plaintiff did formally request a time extension of 63 calendar days to compensate for high flows. The contracting officer's findings of fact determined that plaintiff had suf-fered a loss of efficiency when it worked on days when less than two roller gates could be closed, and that a 217 calendar day time

extension was fair and reasonable—a 62 day work extension plus 155 days covering the normal winter shutdown period and for months when the flows normally would preclude the Corps from closing at least two dam gates. On January 12, 1984, the parties mutually executed Contract Modifi-cation P00002 granting plaintiff the time extension, but no adjustment in price. Consequently, the resident engineer issued a directive acknowledging that defendant would recognize the need for additional time when river flows exceeded 33,000 cfs, thereby preventing closure of at least two roller gates which was necessary for the contractor to work efficiently.

As a result of the contract modification, the revised contract completion date be-came October 1, 1984. On August 24, and September 6, 1984, plaintiff, citing Special Provision 1A–6.4, requested a time exten-sion in order to schedule its operations to take advantage of the most favorable river stages which existed during October and November. Plaintiff specifically asked for the extension at no additional cost. On September 14, 1984, the parties mutually executed modification P00006 which ex-tended the contract completion date 31 cal-endar days to November 1, 1984. The mod-ification contained no adjustment to the contract price, and stated that "[t]his modi-fication constitutes compensation in full on behalf of the contractor ... for all costs and markups directly or indirectly attribut-able to the changes ordered herein, for all delays related thereto, and for performance of the changes within the time stated."

On September 10, 1984, plaintiff request-ed another delay because its stone suppli-ers could not furnish sufficient quantities of stone for Lock and Dam No. 10 before mid-October 1984. Both parties mutually executed Contract Modification P00008 on December 21, 1984, allowing an additional 38 calendar days for performance. This modification again specified that there would be no change in the contract price, and included the "compensation in full" clause.

Once the stone supply became available, plaintiff resumed work and completed rock

fill operations despite river flows exceeding 33,000 cfs, and productivity levels below 50%. Because flows were not expected to decrease, both parties agreed that plaintiff should halt further operations and demobilize for the winter. On January 8, 1985, both parties executed modification P00010 which granted plaintiff a 295 calendar day extension because of high river flows. The revised contract completion date was September 30, 1985, and the modification again included the provision that there would be no increase or adjustment to the contract price.

On August 30, 1985, plaintiff mobilized to resume work at Lock and Dam No. 10, but once again could not work because of high river flows. On September 10, 1985, plaintiff, citing past time extensions and the continuation of extraordinarily high river flows, asked defendant to terminate the contract for convenience. After reviewing the contractor's costs, defendant, on March 25, 1986, informed plaintiff that terminating the contract was not in the government's best interest. Instead, because high flows had persisted, on April 21, 1986, defendant granted plaintiff a time extension of 365 days under Contract Modification P00011. Modification P00011 contained the same "compensation in full" provision as three of the previous four time extensions, however, plaintiff, in a letter dated April 30, 1986, for the first time objected to the contract modification, stating that it did not want to waive its right to compensation for costs, and would not sign an agreement including such a phrase. On May 30, 1986, defendant informed plaintiff that it would not delete the provision from the contract modification, but that plaintiff could consider the modification a unilateral change to the contract and seek further remedies under the contract disputes clause.

Also during this time, the Corps revised the guidelines for closing the dam gates, allowing more gates to be closed at higher flow rates. The Corps notified plaintiff on March 20, 1986, of the changes, and provided the contractor with the new criteria. Specifically, two roller gates would be closed when river flow fell below 50,000 cfs.

Unusually high river flows, and the winter shutdown period, necessitated unilateral Contract Modifications P00012 and P00013 under which plaintiff received time extensions, with no price adjustments, of 32 and 333 calendar days respectively. The new contract set the completion date at September 30, 1987. By April 14, 1987, under the revised gate closure guidelines, plaintiff was able to complete substantially all of the work at Lock and Dam No. 10.

On October 26, 1987, plaintiff submitted a certified claim to the contracting officer for an equitable adjustment for costs and damages in the amount of $233,893.78. On April 18, 1988, the contracting officer issued a final decision denying plaintiff's claim, whereby plaintiff brought this action pursuant to the Contract Disputes Act, 41 U.S.C. § 601.

## DISCUSSION

Summary judgment is appropriate when there are no genuinely disputed issues of material fact so that the moving party is entitled to judgment as a matter of law. RUSCC 56(c); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir.1987). A "material fact" is a fact that will make a difference in the outcome of a case. *Curtis v. United States*, 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Only disputes over facts that might affect the outcome of a suit properly will prevent the court from entering judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden of proof rests upon the party opposing the motion to prove by sufficient evidence that a genuine issue of material fact positively remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The procedure of summary judgment is properly regarded not as a disfavored shortcut, but rather as an integral part of the court rules as a whole, which rules are designed to secure a just, speedy, and inexpensive determination of each and every

action. *Id.* at 327, 106 S.Ct. at 2555. Plaintiff presented several arguments to justify its claim to additional compensation for all seven delay modifications.

*I. Accord and Satisfaction*

■ Defendant argued that the claims against the first four bilateral contract modifications were barred by accord and satisfaction. Under that doctrine, both an accord and satisfaction must be present. *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 92 (1989). An accord is an agreement by one party to supply or perform, and by the other party to accept, in settlement or satisfaction of an existing claim, something other than what originally was due. *Chesapeake & Potomac Tel. Co. v. United States,* 654 F.2d 711, 716, 228 Ct.Cl. 101 (1981). Satisfaction is the execution and/or performance of the agreement, the actual giving or taking of some agreed upon item or service. *Id.* A party claiming an accord and satisfaction must show "proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Brock & Blevins Co. v. United States,* 343 F.2d 951, 955, 170 Ct.Cl. 52 (1965). Generally, this entails "a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute." *Id.*

■ The plain and unambiguous language of modifications Nos. P00002, P00006, P00008, and P00010 provided that the defendant would extend the contract completion date a specified number of calendar days, with no modification to the contract price. The latter three unilateral modifications contained the clause, "[t]his modification constitutes compensation in full on behalf of the contractor ... for all costs and markups directly or indirectly attributable to the changes ordered herein, for all delays related thereto, and for full performance of the changes within the time stated." Defendant argued that these time extensions, to which the parties agreed, represent consideration, and therefore sat-

isfaction, of plaintiff's potential delay claims, *i.e.,* an accord and satisfaction.

The basis of plaintiff's complaint is that a "meeting of the minds" between the parties never existed. Plaintiff contended that it in no way intended to waive or compromise any rights to an equitable adjustment when it signed the modifications. However, if that were the case, plaintiff would not have executed the first four mutual contract modifications without challenging the "no additional compensation" language. It was not until April 30, 1986, during negotiations for the fifth time extension, and after defendant refused to terminate the contract for convenience, that plaintiff first refused to waive its right to compensation for delay costs. Plaintiff never had objected to any of the terms of the previous modifications, and while negotiating Contract Modification P00006, specifically had requested a time extension at no additional cost.

Plaintiff cannot escape the plain language of the first four modifications that the time extensions were consideration in full for the delays. In reading the terms of the modifications, the court must give ordinary words their ordinary meaning. *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 234 (1989). Furthermore, the court is precluded from considering extrinsic evidence to vary the meaning of clear, unambiguous language. *Id.* Looking solely at the plain language of each of the first four contract modifications, and in light of the fact that plaintiff executed each agreement without any reservation of claim for additional compensation, plaintiff's argument that the parties did not intend the modifications to provide "compensation in full" because there was no meeting of the minds must fail.

Plaintiff also argued that defendant, in considering plaintiff's request for a termination for convenience, which might have entailed the review of delay costs, evidenced that it considered the first four modifications furthermore compensable. The court disagrees. Plaintiff's suggestion is at odds with the plain language of the contract modifications, and as extrinsic evi-

dence will not be considered to alter this court's interpretation of the first four modifications as exhibiting a full accord and satisfaction. Accordingly, plaintiff waived any rights it might have had under the terms of the contract for additional compensation stemming from the first four delay modifications. That is not, however, dispositive of the last three unilateral time extensions. The court now will consider plaintiff's arguments that defendant is responsible for the unilateral delays thereby justifying additional compensation on those extensions.

## II. Differing Site Conditions

▮ Plaintiff's contract with the Corps contained the standard differing site conditions clause, DAR 7-602.4.[1] To prevail upon a Type I differing site condition, the contractor must prove, by a preponderance of the evidence, "that the conditions 'indicated' in the contract differ[ed] materially from those it encounter[ed] during performance." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). The conditions actually encountered reasonably must have been unforeseeable based on all the information available to the contractor at the time of bidding. *United Contractors v. United States*, 368 F.2d 585, 594, 177 Ct.Cl. 151 (1966). The contractor also must show that it reasonably relied upon its interpretation of the contract and contract documents, and that it was damaged as a result of the material variation between the expected and the encountered conditions. *Sanders Constr. Co. v. United States*, 618 F.2d 121, 220 Ct.Cl. 639, 641 (1979).

▮ A differing site conditions claim initially is dependent on what is "indicated" in the contract because "a contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *Maffei*, 732 F.2d at 916. While the contract indications need not be explicit or specific, the contract must con-

tain "reasonably plain or positive indications" that conditions would be different from what the contractor actually encountered. *Id.* Interpretation of a contract presents a question of law. *Dynamics Corp. of Am. v. United States*, 389 F.2d 424, 429, 182 Ct.Cl. 62 (1968). Determining whether the contract with the government contained any "indications" regarding the site condition is a matter of contract interpretation, and thus presents a question of law which this court may decide by placing itself in the shoes of a "reasonable and prudent" contractor. *Maffei*, 732 F.2d at 916.

Plaintiff maintained that the contract documents indicated what the river flow conditions during the contract period would be. It argued that a reasonable contractor would consider the table attached to the contract representing "Approximate Average Monthly Flow" as part of the contract specifications, and reliable indications of the expected river flow. However, the table provided by the Corps merely was historical data given to the contractor as a general guideline for scheduling operations. The tables specifically indicated that the contractor was to use them only as *guides* for scheduling purposes. As a matter of common knowledge, weather conditions fluctuate from year to year, oftentimes wildly. No reasonable contractor would presume that such information constituted indications of river flow conditions for the specific years the contract was to be performed, as defendant reasonably could not be expected to predict weather conditions for the upcoming contract period. Where reasonably there are no representations as to what conditions are, there can be no differing site condition. *Pacific Alaska Contractors v. United States*, 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971).

▮ Plaintiff also must show that the actual conditions encountered were unforeseeable, and that its interpretation of the contract was reasonable. *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 350

---

1. The standard differing site conditions clause allows recovery for both Type I and Type II claims. However, plaintiff did not plead a Type II differing site condition and, therefore, it is not at issue before the court.

(1987), *aff'd*, 848 F.2d 1245 (Fed.Cir.1988). The underlying issue in a Type I differing site claim is whether the contractor reasonably could have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, its inspection of the site, and its general experience as a contractor. *Erickson–Shaver Contracting Corp. v. United States*, 9 Cl.Ct. 302, 304 (1985). As noted, defendant neither represented, nor indicated what specific river flow conditions plaintiff would encounter during the contract period. Monthly river flows presumably would vary from the averages set forth in the contract tables, for that is the nature of averages. "By definition, averages are composed of figures both greater and less than the average," *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, *aff'd*, 834 F.2d 1576 (Fed.Cir.1987), and it was not unforeseeable that river flows would be greater than those listed in the table, at the very least, part of the time. Plaintiff must have anticipated such an occurrence. Furthermore, plaintiff is an experienced contractor as evidenced, in part, by his scour protection work on Lock and Dam No. 5, and should have been aware that river flow is related directly to weather conditions. *See Hardeman–Monier–Hutcherson v. United States*, 458 F.2d 1364, 1371, 198 Ct.Cl. 472 (1972). Because rainfall changes year to year, a reasonable contractor entering into a firm, fixed price contract would not rely alone on historical river flow averages, denoted as approximate, without some further assurances of the conditions it would encounter. The site investigation clause (DAR 7–602.33) warned plaintiff that the contractor was responsible for checking site conditions. Special Provision 1A–6.2 informed plaintiff that "[e]ach bidder should satisfy himself before submitting his bid, as to hazards to arise from weather conditions. Complete weather records and reports may be obtained from the local U.S. Weather Service." These contract provisions, along with plaintiff's general knowledge, demonstrated that plaintiff's interpretation of the contract, and reliance on the "approximate average monthly flow" table was unjustified.

Admittedly, the contractor experienced unusually high river flows due to heavier than normal precipitation during the time for contract performance. However, under the differing site conditions clause, the government generally does not assume an obligation to compensate a contractor for additional costs or losses resulting solely from weather conditions which neither party expected or could anticipate, and not from any act of fault of the government. *Turnkey Enters. v. United States*, 597 F.2d 750, 759, 220 Ct.Cl. 179 (1979). Weather conditions are considered acts of God for which neither party is obligated to the other for additional costs or price increases. *Arundel Corp. v. United States*, 103 Ct.Cl. 688, 711–12, *rehearing denied*, 326 U.S. 808, 66 S.Ct. 166, 90 L.Ed. 493, *cert. denied*, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945). Therefore, because plaintiff's delays were the result of weather, and not the fault of the government, there can be no recovery under the differing site conditions clause.

### III. Misrepresentation

 Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose. *Morrison–Knudsen Co. v. United States*, 345 F.2d 535, 539, 170 Ct.Cl. 712 (1965). Where the government possesses special knowledge not shared by the contractor, which is vital to the performance of the contract, the government has an affirmative duty to disclose such knowledge, and cannot remain silent with impunity. *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963). The court's determination of whether the government has breached its duty to disclose information is a question of law. *Hardeman*, 458 F.2d at 1370.

Plaintiff alleged that the Corps misrepresented the average river flows, and failed to disclose critical flow information. The table containing "Approximate Average Monthly Flows" in the contract documents was computed based on river flows at Lock and Dam No. 10 from the years 1937 to

1977. Figures for the six years preceding the invitation for bids were not included, and defendant did not make this fact known to plaintiff. In fact, the actual river flows in 1981 and 1982, the two years immediately preceding the contract, greatly exceeded the averages contained in the table. If the averages had been up to date, the flow rate numbers would have been greater. Plaintiff suggested that it may recover because it reasonably relied to its detriment upon defendant's flow information in calculating its bid, and that information constituted a material misrepresentation. *See Edwards v. United States*, 19 Cl.Ct. 663, 670 (1990). Plaintiff also contended that defendant should have disclosed that, in recent years, the river flows had been higher than normal.

Plaintiff's argument fails for several reasons. The government must disclose superior knowledge which is vital to performance of the contract, but which is unknown and reasonably is not available to the contractor. *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 52 (1985), *aff'd*, 790 F.2d 90 (Fed.Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986). But there is no duty to disclose where the information reasonably is available. *L.G. Everist, Inc. v. United States*, 231 Ct.Cl. 1013, 1018 (1982), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). The contract directed plaintiff to conduct a site investigation, and to check the weather records and reports at the local U.S. Weather Service. Plaintiff's representative visited the site, but did not examine any hydrology reports which measure river flow. Plaintiff admitted knowing that the Corps keeps hydrology reports showing river flows, but believed it was excused from seeking out the reports because the contract documents did not indicate they were available. However, plaintiff also never checked with the U.S. Weather Bureau where rainfall and flow predictions readily were available. When a contractor knows or has an opportunity to learn the facts, it is unable to prove that it was misled by the contract. *Vann v. United States*, 420 F.2d 968, 982, 190 Ct.Cl. 546 (1970). Furthermore, bidders may not rely solely upon the information contained in a contract when the contract specifically referred bidders to additional information. *Flippin Materials Co. v. United States*, 312 F.2d 408, 413, 160 Ct.Cl. 357 (1963). Because plaintiff had critical river flow information reasonably available to it, and specifically was directed to that information, the claim for misrepresentation must fail as a matter of law.

That the average monthly flow table provided in the contract was not computed to include the most recent six years, or that the government failed to notify the contractor of this fact, does not constitute a misrepresentation. A six-year period of unusually high river flow cannot invalidate forty years of data. *See Hendricks v. United States*, 14 Cl.Ct. 143, 150 (1987). The vital information was the river flow for the period of contract performance. The fact that the river flows from 1978–1983 would have raised the averages listed in the table does not prove that the averages were wrong, only that whatever reliance plaintiff placed on them was unreasonable.

## IV. Defective Specifications

Design specifications explicitly state how a contract is to be performed, and generally permit no deviation. *Stuyvesant*, 834 F.2d at 1582. Design specifications contain an implied warranty that if they are followed, the contractor can produce an acceptable result. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). Performance specifications, conversely, specify the results to be obtained, and leave to the contractor the responsibility of determining how to achieve those results. They contain no warranty. *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (1969).

Plaintiff contended that the gate closure criteria table included in the contract documents was a design specification, and that the change ordered by the government in 1986 allowing dam gate closure at higher flow rates allowed recovery under the contract changes clause (DAR 7–602.3).

Plaintiff assumed that because defendant revised the gate closure criteria, it must have realized that the original criteria were defective. However, the table stating the guidelines by which the Corps would operate gate closures is not a design specification at all. This table clearly did not instruct plaintiff how to perform its scour protection work under the contract. *See Stuyvesant,* 834 F.2d at 1582. It merely set forth the criteria defendant would utilize in deciding when to close the dam gates.

Plaintiff retained complete discretion over scheduling operations and the stone placement required for scour protection. Defendant never warranted that by following the gate closure criteria, the contract could be performed in 200 days. Performance was dependent on too many other factors, most notably river flow. The sole purpose of the criteria was to inform plaintiff that defendant would close as many dam gates as possible to assist the contractor in performance of the contract. Defendant never obligated itself to close a specified number of gates and, in fact, could not and still meet its water level obligations. The provision was nothing more than information for which the government did not warrant accuracy or adequacy. *Id.* Furthermore, the fact that defendant revised the gate closure limits does not indicate that the original regulations were defective. The government merely acted in its discretionary nature to institute an internal procedural change which actually inured to the contractor's benefit.

*V. Termination for Convenience*

 Plaintiff charged that the government should have terminated the contract for convenience, and that its refusal to do so was unreasonable and a direct cause of compensable delays. The government may terminate a contract for convenience where conditions, or the parties expectations, have changed without fault of the contractor. *SMS Data Prods. Group, Inc. v. United States,* 19 Cl.Ct. 612, 619 (1990). The government has the right to terminate a contract when it is in the government's best interests, but has no

duty to the contractor to terminate when it is in the contractor's best interests. *Rotair Indus., Inc.,* 84–2 B.C.A. (CCH) ¶ 17,417 (ASBCA 1984), 1984 WL 13444. Here, the contracting officer determined that it was not in the government's best interests to terminate the contract for convenience. The standard of review for that decision is whether the contracting officer acted in bad faith, or clearly abused his discretion. *SMS Data,* 19 Cl.Ct. at 619. However, a presumption exists that government officials "discharge their duties, correctly, lawfully, and in good faith," *Hoffman v. United States,* 16 Cl.Ct. 406, 410 (1989), *aff'd,* 894 F.2d 380 (Fed.Cir. 1990), and "[i]t takes well-nigh irrefragable proof to overcome [this] presumption." *Sanders v. United States Postal Serv.,* 801 F.2d 1328, 1331 (Fed.Cir.1986). Plaintiff contended only that defendant created the conditions which prevented the contractor from timely performing the contract work, not that the contracting officer acted in bad faith. Plaintiff offered absolutely no evidence of bad faith or a clear abuse of discretion. Therefore, its claim that defendant should have terminated the contract for convenience must fail.

### CONCLUSION

For the foregoing reasons, the court finds no existence of genuine issues of material fact. Defendant was not responsible for plaintiff's delays, and is correct in its presentations of the issues of law. The court grants defendant's motion for summary judgment. The Clerk of the court is directed to dismiss the complaint and enter judgment accordingly. Costs to defendant, the prevailing party.

IT IS SO ORDERED.