MEYERS COMPANIES, INC., a Kansas Corporation, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–632C.

United States Court of Federal Claims.

July 7, 1998.

---

Richard W. Miller, Kansas City, Missouri, for plaintiff.

Alan J. Lo Re, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

MEROW, Judge.

This matter, before the court on defendant's motion for summary judgment, involves a contract between the plaintiff, Meyers Companies, Inc. ("Meyers"), and the government for the construction of a stone fill dike in the Mississippi River. During performance, Meyers encountered shallow water which delayed work for a significant period. Meyers asserts that it is entitled to an equitable adjustment for the costs incurred during the delay because the shallow water constituted a Type I differing site condition and because the government misrepresented the water depth in the bidding documents and failed to disclose that it would act to lower the water level. As discussed below, it is concluded that plaintiff's differing site conditions claim lacks merit because the existence of prolonged periods of shallow water was reasonably foreseeable and did not differ materially from the indications in the bidding documents. Plaintiff's claim of misrepresentation and nondisclosure is also rejected because it is unsupported. Therefore, defendant's motion for summary judgment is granted.

## BACKGROUND

Unless otherwise noted, the following facts are not in dispute. On May 28, 1991, the United States Army Corps of Engineers, St. Louis District ("Corps"), issued solicitation no. DACW43–91–B–0016 to prospective bidders, including Meyers. The solicitation invited firm, fixed-price bids for the construction of a 10,200 linear foot stone fill dike around Pharrs Island, Missouri, located near Lock and Dam No. 24 on the Mississippi River.

The solicitation provided that construction was to be completed within 150 days after issuance of the Notice to Proceed. Section 2B–3, "Order of Work," stated that the contractor "shall construct the dike work starting at Station 0 + 00 and shall proceed in the direction of increasing stations." Def.'s App. 7. Section 2B–1, "Scope," stated that the work "shall be completed as expeditiously as possible" and "requires steady and uninterrupted progress to minimize loss of stone during construction." *Id.*

Section 2B–2 of the solicitation, "River Stage and Weather Limitations," informed prospective bidders that work could be delayed as a result of low pool stages (water levels) and provided for an extension of the 150-day performance period if such a delay occurred:

> In the event low pool stages require the Contractor either to lighten his barges or to suspend operations entirely, the Contracting Officer will determine the extent of the delay to work as a whole, and the time fixed for completion of the contract will be extended for the period of such delay.

Def.'s App. 7.

The bidding package also included drawing 220.1409, "Stage Hydrograph," containing hydrographs for Lock and Dam No. 24 from 1973 to 1988. A hydrograph depicts the river surface elevation at a particular location according to the National Geodetic Vertical Datum of 1929 ("NGVD"), a standard for measuring elevation similar to mean sea level. According to John Massman, assistant vice-president of Meyers, pool stages below 449 feet NGVD at Lock and Dam No. 24 constitute non-working levels. Massman Aff. ¶ 10, Pl.'s App. 5. The hydrographs in drawing 220.1409 indicate that, during the sixteen years covered, the pool stage often dropped to non-working levels, sometimes for extended periods, during the same time of year when Meyers encountered shallow water. For instance, the pool stage remained below 449 feet for significant periods between September 1973 and May 1974. From early October to early December 1982, the pool

stage remained below 449 feet and hovered around 445.5 to 447 feet for over half of November. After a short period above 449 feet during December 1982, the pool stage again dropped to non-working levels until late January 1983. The pool stage also dropped to non-working levels during the latter half of November and the first half of December 1983. In 1985, the pool stage remained well below 449 feet for virtually all of October, most of November, and part of December. In 1986, the pool stage ranged from about 445.5 to about 447.5 for nearly all of November and part of December. The hydrographs also show that the pool stage dropped to non-working levels for shorter periods during December 1980, November 1984, December 1984, January 1985, and December 1987.

The bidding materials also included drawing 240.1406, "Site Plan," which depicts riverbed elevations at the project site. The soundings used in the Site Plan were taken during July 1988 and February 1989. For station 30+00, the position where Meyers suspended operations due to shallow water, the Site Plan indicates a riverbed elevation of 443 feet NGVD.

Clause 68 of the solicitation contained the standard "Differing Site Conditions" clause set forth in the Federal Acquisition Regulation ("FAR"). This clause provides for an equitable adjustment increasing the contract price when "Type I" or "Type II" differing site conditions are discovered which increase the cost of performance. Type I differing site conditions are defined as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." 48 C.F.R. § 52.236–2(a) (1991). Type II conditions are defined as "unknown physical conditions at the site of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." *Id.*

Clause 84 of the solicitation contained the standard "Changes" clause set forth in the FAR which provides for an equitable adjustment increasing the contract price for changes in the work causing an increase in the cost of performance. 48 C.F.R. § 52.243–4 (1991).

Finally, the solicitation informed bidders of a Corps-sponsored, pre-bid site visit to occur on June 12, 1991. Bidders were also invited to conduct their own unaccompanied site visits prior to bidding. During the June 12, 1991 visit, one prospective bidder expressed concern about shallow water. In response, the Corps directed those present to section 2B–2 of the solicitation which, as discussed above, provides for time extensions for delays caused by low water levels.

Meyers did not participate in the Corps-sponsored site visit or conduct its own visit prior to bidding. An individual who did attend the June 12, 1991 site visit subsequently informed Gerald Stevens, Meyers' Superintendent/Operator, that he viewed shallow water around station 30+00. Also, in October 1991, after contract award, Mr. Stevens and Dale Elsenrath, Meyers' Quality Control Manager/Assistant Superintendent, took soundings at the work site and determined that the water was "pretty shallow" from about station 30+00 to station 45+00. Def.'s App. 28–29, 77–78.

Meyers submitted its bid on July 1, 1991. Based on the statement in section 2B–1 of the solicitation that work was to proceed "expeditiously" and required "steady and uninterrupted progress," and based on the 150-day contract term which, according to Mr. Massman, is relatively short in comparison to the 360-day period used by the Corps in similar projects, Meyers believed at the time of bidding that construction would proceed without prolonged delays due to shallow water. Massman Aff. ¶¶ 6–9, Pl.'s App. 4–5. Though he states that Meyers reviewed the hydrographs prior to bidding, Mr. Massman asserts that there were no indications in any of the bidding materials that pool elevations would be at non-working levels (below 449.0 feet NGVD) for a sustained period. Massman Aff. ¶ 10, Pl.'s App. 5.

On August 27, 1991, the Corps awarded the contract (no. DACW43–91–C–0440) to Meyers at a total price of $935,000. Meyers received the Notice to Proceed on October 31, 1991 and began work on November 1,

1991.[1] On November 28, 1991, Meyers halted operations at station 30+00 due to shallow water. At the time, the pool stage was 446.9 feet and the riverbed elevation 445.0 feet NGVD. According to Meyers, the low water level was due to the Hydraulics Branch of the Corps drawing down the pool stage to avoid spring flooding. Mr. Massman states that the Corps never informed Meyers during the bidding period or prior to construction that it would lower the pool stage, although he acknowledges that he does not know when the Corps knew it would lower the pool. He adds that Meyers would not have bid for the contract had it known the Corps would lower the pool stage. Massman Aff. ¶¶ 14–19; Pl.'s App. 6–8.

The delay due to shallow water continued for 69 days. During this period, the pool stage fluctuated from a high of 449.1 feet to a low of 445.5 feet NGVD, with an average elevation of 447.8 feet NGVD. Def.'s App. 38. On February 5, 1992, after the water level had risen sufficiently, Meyers recommenced operations.

By letter dated February 11, 1992, Meyers requested a time extension of 69 days as a result of the delay and stated that the low pool stage constituted a changed condition under the Changes clause. On March 26, 1992, the Corps issued a contract modification extending the contract term by 66 days. Meyers completed contract performance on May 7, 1992.

On December 30, 1992, Meyers submitted a claim for an equitable adjustment in the amount of $150,682.11 for the costs incurred during the 69-day shutdown. Meyers asserted that it was entitled to relief under the Differing Site Conditions clause and the Changes clause. On October 6, 1995, Meyers resubmitted its request to the Contracting Officer as a certified claim under the Contract Disputes Act, 41 U.S.C. §§ 601–612 (1994). On October 12, 1995, the Contracting Officer denied the claim in its entirety.

Meyers initiated this action on October 8, 1996. In the complaint, Meyers asserts that it is entitled to an equitable adjustment for the costs incurred during the 69-day delay because the low pool stages and high riverbed elevations were Type I and Type II differing site conditions and changes. Meyers also asserts that the project design and specifications were defective and that the Corps acted to lower the pool stages without notifying Meyers in advance. Meyers requests a judgment in the amount of $150,000 plus interest, costs, and attorney fees.

On February 7, 1997, a Pretrial Order was entered establishing procedures (in lieu of those in RCFC Appendix G) for the complete disclosure of each party's case. The procedures follow the order in which evidence would be presented at trial. Pursuant to paragraph 1 of the Pretrial Order, Meyers was required to disclose the evidence comprising its complete case-in-chief in the initial submissions due April 10, 1997. Sixty days thereafter, defendant was required to submit its complete case pursuant to paragraph 2. Finally, pursuant to paragraph 3, plaintiff was to submit a reply 30 days after receiving defendant's paragraph 2 materials.

Paragraph 5 of the Pretrial Order, "Complete Submissions, Discovery, and Amendment of Pleadings," made clear that "the pretrial submissions shall each be complete" and that "[d]iscovery, if required, shall be undertaken prior to each pretrial submission." Pretrial Order at 5. The Order stated further that "[i]f an enlargement of time for any submission is needed, the requirements of Rule 6(b) [pertaining to motions for time extensions] shall be applicable." *Id.*

On March 14, 1997, plaintiff filed a "Motion to Allow Discovery," requesting that RCFC Appendix G be reinstated and that plaintiff be given an opportunity to conduct discovery. By Order dated March 21, 1997, the court denied the motion, reiterating that the Pretrial Order "provides for discovery to be undertaken, as and if needed, prior to each pretrial submission." Order at 1. Plaintiff was reminded that it was required to "undertake whatever discovery is needed to set forth its case-in-chief prior to prepar-

---

**1.** Meyers actually subcontracted the work to JMC Corporation ("JMC"). Mr. Massman, assistant vice-president of Meyers, is also the principle of JMC. For simplicity, Meyers will be referred to as the contractor who performed the work.

ing and submitting its initial pretrial response" and that "any concern with respect to any additional time reasonably required for the discovery now contemplated would be accommodated by a motion for an appropriate enlargement of the time for the initial pretrial submission." *Id.* at 2–3.

On August 6, 1997, after receiving three enlargements of time to conduct discovery and prepare its submissions, plaintiff furnished the materials required by paragraph 1 of the Pretrial Order. In its memorandum of law, plaintiff sets forth two theories of recovery. First, plaintiff asserts that the low pool stages and high riverbed elevations encountered during performance differed materially from the conditions indicated in the bidding documents and therefore constituted Type I differing site conditions. Second, plaintiff asserts a right to recover based on misrepresentation and failure to disclose material information. Plaintiff maintains that the Corps failed to disclose the dates covered by information in the bid documents and unspecified riverbed elevation data. Plaintiff also argues that the Corps "knew it would draw the pool stages down and did not disclose this to the bidders." Pl.'s App. 75.

On February 23, 1998, after receiving several extensions of time to submit its pretrial materials, defendant filed a motion to stay further compliance with the Pretrial Order so that it could file a motion for summary judgment. The unopposed motion was granted by Order dated February 25, 1998.

On March 27, 1998, defendant filed the subject motion for summary judgment. With respect to plaintiff's Type I differing site conditions claim, defendant argues that it is entitled to judgment as a matter of law because shallow water conditions were foreseeable based on the terms of the solicitation, the hydrographs, and the information reasonably obtainable from a pre-bid site visit. In

addition, defendant maintains that since contract provision 2B–2 provides only for a time extension for interruptions due to shallow water, the principle of *expressio unius est exclusio alterius* requires that other remedies, such as increased costs, be excluded by implication. Finally, defendant asserts that it is entitled to judgment on plaintiff's misrepresentation and nondisclosure claims because plaintiff has not presented any evidence in support of the claims.

Plaintiff filed its opposition on May 26, 1998. Plaintiff asserts that genuine issues of material fact preclude the entry of summary judgment. Additionally, plaintiff argues that it can establish the existence of a Type I differing site condition because "the contract documents represented, and the contractor's experience formed the basis of a reasonable assumption, that a sustained dormant period due to low pool levels should not be expected or encountered on this project." Pl.'s Opp. at 9–10. Plaintiff also maintains that section 2B–2 of the contract is not a "no damages for delay" clause and therefore does not preclude recovery of costs incurred during the 69-day delay. Finally, plaintiff, through the affidavits of Mr. Massman and Weston A. Sechtem, one of plaintiff's attorneys, asserts that defendant's motion should be denied because Meyers needs additional discovery to prove its misrepresentation claim.[2]

The court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a) (1994), and the Contract Disputes Act, 41 U.S.C. § 609(a).

## DISCUSSION

### 1. Summary Judgment Standards

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to prevail as a matter of law. RCFC 56(c); *Mingus Con-*

---

**2.** Plaintiff also appears to argue that the government ordered a compensable change by arbitrarily refusing to waive Meyers' obligation under contract clause 2B–3 to start work at station 0+00 and "proceed in the direction of increasing stations." Pl.'s Opp. 5. However, plaintiff offers no evidence that the government acted arbitrarily and also fails to explain how the government's alleged refusal amounts to a compen-

sable change. Therefore, plaintiff's change claim is rejected.

Furthermore, to the extent plaintiff has failed to assert its Type II differing site conditions, changes, and defective specifications claims in its pretrial materials or in its opposition to defendant's motion, the claims are deemed abandoned.

*structors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material if it affects the outcome of the case. *Young Enters., Inc. v. United States*, 26 Cl.Ct. 858, 863 (1992). A dispute over a material fact is genuine if, based on the evidence presented, a reasonable factfinder could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment "bears the burden of demonstrating the absence of genuine issues of material fact." *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994). The movant may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to present evidence demonstrating the existence of a genuine issue of material fact. *Id.*

### 2. Type I Differing Site Condition

■ As stated above, the Differing Site Conditions clause entitles Meyers to an equitable adjustment when Type I differing site conditions, *i.e.*, "subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract," increase the cost of performance. 48 C.F.R. § 52.236–2. "Success on a Type I Differing Site Conditions claim turns on the contractor's ability to demonstrate that the conditions 'indicated' in the contract differ materially from those it encounters during performance." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). "The conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed.Cir. 1987). The contractor must also show that it "acted as a reasonably prudent contractor in interpreting the contract documents" and

"*reasonably* relied on the indications of subsurface conditions in the contract." *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193, 218 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir.1988) (emphasis in original).

■ Plaintiff's differing site conditions claim fails because the existence of shallow water conditions which could delay work for a significant period was reasonably foreseeable and did not differ materially from the indications in the bidding documents. Section 2B–2 of the solicitation specifically informed Meyers that work could be delayed due to low pool stages and that the 150-day performance period would be extended if such a delay occurred. In addition, the hydrographs plainly indicate that, during many of the sixteen years covered, the pool stage at Lock and Dam No. 24 dropped to non-working levels, sometimes for sustained periods, during the same time of year when Meyers encountered shallow water.[3] Thus, as a matter of law, the existence of a sustained period of low pool stages cannot constitute a Type I differing site condition. *See P.J. Maffei*, 732 F.2d at 916; *Stuyvesant Dredging*, 834 F.2d at 1581.[4]

■ Plaintiff appears to argue, however, that the shallow water constituted a differing site condition even if low river *surface* elevations were foreseeable because the high river*bed* elevations differed materially from those indicated in the Site Plan. For station 30+00, the Site Plan depicts a riverbed elevation of 443 feet NGVD. According to Meyers, on November 28, 1991, when Meyers was forced to cease operations, the riverbed elevation at station 30+00 was 445 feet NGVD.

The presumption underlying plaintiff's argument which is not directly addressed by either party is that performance would have been possible despite the low river surface elevations if the riverbed elevations had been

---

3. Mr. Massman's assertion that "there were no indications in the information available to the contractor that pool elevations would be at non-working levels (below 449.0 feet) for a sustained period," Massman Aff. ¶ 10, Pl.'s App. 5, is simply incorrect in light of the information in the hydrographs.

4. Since the bidding documents sufficed to put Meyers on notice of the possible existence of sustained periods of low pool stages, the issue of what was discoverable from a reasonable site visit is immaterial.

as depicted in the Site Plan. Even granting Meyers this presumption, however, the higher riverbed elevations did not constitute Type I differing site conditions. As stated above, Meyers must show that it "acted as a reasonably prudent contractor in interpreting the contract documents" and that it *"reasonably* relied on the indications of subsurface conditions in the contract." *Weeks Dredging,* 13 Cl.Ct. at 218; *Stuyvesant Dredging,* 834 F.2d at 1581. The record makes clear that, to the extent Meyers relied on the Site Plan as indicating what the riverbed elevations would be during contract performance, its reliance was unreasonable. The soundings in the Site Plan were taken in July 1988 and February 1989, nearly three years before contract award. Mr. Stevens, Meyers' Superintendent/Operator, testified during his deposition that he was aware of the soundings in the Site Plan but "wasn't too much interested in them" because riverbed elevations could change significantly over three years. Def.'s App. 9a–11; Pl.'s App. 13. Similarly, Mr. Elsenrath, Meyers' Quality Control Manager/Assistant Superintendent, testified that he too was aware of the information in the Site Pan but did not consider it particularly important

> [b]ecause the river bed changes, the soundings were taken, again, three years before we were there. A lot can change in three years.
>
> What happened three years ago does not help you out there. You've got to know what you've got now, so that's the only thing that mattered.

Def.'s App. 12. Since Meyers' own representatives performing the work did not believe the information in the Site Plan was useful in determining riverbed elevations, Meyers' alleged contrary belief at the time of bidding was not reasonable and cannot support a Type I differing site conditions claim.

Finally, Meyers asserts that it reasonably assumed performance would be free of prolonged interruptions due to shallow water based on section 2B–1 of the solicitation, which provides that "[t]he work requires steady and uninterrupted progress to mini-

mize loss of stone during construction," and based on the Corps' use of a 150-day performance period. According to Mr. Massman, similar Corps projects have used a 360-day performance period to allow for delays due to high or low water. He states that Meyers assumed the use of a shorter 150-day period meant there would be no sustained interruptions due to low pool stages. Massman Aff. ¶¶ 6–8, Pl.'s App. 4–5.

Again, however, the record reflects that Meyers' interpretation of the solicitation was unreasonable. "Contracts and solicitations are to be read as a whole, so as to give meaning to all provisions." *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 144 (1997); *B.D. Click Co., Inc. v. United States,* 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). "To arrive at a reasonable interpretation a contractor must consider all relevant documents in the solicitation. Thus, a contractor will be found to have interpreted the contract unreasonably where it can be shown that its interpretation is unsupported by the contract indications or that it is based on one contract indication to the exclusion of others." John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 506 (3d ed.1995). Meyers' interpretation of section 2B–1 and the 150-day contract term as indicating that the work would be free from significant interruptions due to low pool stages ignores section 2B–2, which plainly states that the 150-day performance period would be extended for delays caused by low pool stages, and the hydrographs, which clearly show that the pool stage sometimes dropped to non-working levels for sustained periods during the same time of year contract performance was to occur. Since Meyers' interpretation of isolated solicitation provisions was not consistent with the bidding documents as a whole, it was unreasonable and cannot support a Type I differing site conditions claim. Therefore, and for the reasons stated above, defendant is entitled to summary judgment on the claim.[5]

---

5. Since plaintiff's differing site condition claim fails as a matter of law, the government's defense of *expressio unius est exclusion alterius* need not be addressed.

### 3. Misrepresentation

■■■ "Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." *John Massman Contracting Co. v. United States*, 23 Cl.Ct. 24, 31 (1991) (citing *Morrison–Knudsen Co. v. United States*, 170 Ct.Cl. 712, 718–19, 345 F.2d 535, 539 (1965)). Plaintiff alleges that the government committed misrepresentation by failing to disclose the date of data in the bid documents, failing to provide bidders with certain unspecified riverbed elevation data, and failing to inform bidders that it would lower the pool stages.

However, as defendant correctly points out, these allegations are completely unsupported. First, the hydrographs plainly show that they cover the sixteen-year period from 1973–1988, and the Site Plan shows that the soundings were taken in 1988 and 1989. Plaintiff fails to identify any other bidding material which does not indicate the time period covered. Second, plaintiff offers no support for its allegation that the government withheld riverbed elevation data or knew it would draw down the pool stages prior to award but failed to inform bidders.[6] Since there is an absence of evidence to support plaintiff's misrepresentation claim, defendant is entitled to summary judgment. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626–27 (Fed.Cir.1984) ("In counter-

ing a motion for summary judgment, more is required than mere assertions of counsel.").

In an effort to avoid summary judgment, plaintiff asserts, through the affidavits of Mr. Massman and Mr. Sechtem, a need to conduct discovery to bolster its unsupported misrepresentation claim.[7] However, in the February 7, 1997 Pretrial Order and again in the March 21, 1997 Order, plaintiff was specifically informed that any discovery needed to support its case-in-chief was to be undertaken prior to the preparation and filing of its pretrial submissions. Plaintiff was also instructed to request additional time if further discovery was needed. Despite these directives, and despite receiving three extensions of time for a total of six months to conduct discovery and prepare its pretrial materials, plaintiff chose to assert its misrepresentation claim without first conducting sufficient discovery to determine if it had any merit.[8]

It is concluded that plaintiff should not benefit from its lack of diligence and failure to follow court orders. Plaintiff was given an adequate opportunity to conduct discovery before submitting its pretrial materials, which were to cover its complete case-in-chief, and its unexplained failure to do so provides no basis for further delaying resolution of the case. *See Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir.1995) (a court "does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past."), *cert. denied*, —— U.S. ——, 117 S.Ct. 56, 136

---

**6.** Furthermore, it appears that plaintiff was or should have been aware that the Corps might lower the pool stage. Mr. Massman stated during his deposition that there was "nothing unusual" about the Corps lowering pool stages in anticipation of increased snow melt. Pl.'s App. 42–43. Mr. Elsenrath also acknowledged that fluctuating pool stages, clearly visible on the hydrographs, is due to actions of the Corps. *Id.* at 48–49. Thus, even if plaintiff could prove nondisclosure, it would not amount to misrepresentation. *See John Massman Contracting*, 23 Cl.Ct. at 32 ("When a contractor knows or has an opportunity to learn the facts, it is unable to prove that it was misled by the contract.") (citing *Vann v. United States*, 190 Ct.Cl. 546, 571, 420 F.2d 968, 982 (1970)).

**7.** Plaintiff presumably is relying on RCFC 56(g) which provides:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that such party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

RCFC 56(g) is substantially equivalent to Fed. R.Civ.P. 56(f).

**8.** Plaintiff's failure to conduct any discovery needed to support its misrepresentation claim is particularly egregious since it has been asserting the claim since at least December 30, 1992. Pl.'s Statement of Genuine Issues ¶ 31; Pl.'s App. 17.

L.Ed.2d 19 (1996); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2741 at 431 (3d ed. 1998) ("[A] request for relief under [Fed. R.Civ.P.] 56(f) is extremely unlikely to succeed when the party seeking the delay has failed to take advantage of discovery.").

## CONCLUSION

Based on the foregoing, it is concluded that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. Therefore, defendant's motion for summary judgment is **GRANTED.** The Clerk is directed to enter judgment in defendant's favor and to dismiss the complaint. No costs.