IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2009 Session

# LEE MASONRY, INC. v. CITY OF FRANKLIN, TENNESSEE
# STANSELL ELECTRIC COMPANY, INC. v. CITY OF FRANKLIN, TENNESSEE

Appeal from the Chancery Court for Williamson County
No. 30483/31022      Timothy L. Easter, Judge

_____

No. M2008-02844-COA-R3-CV - Filed April 28, 2010

_____

Two trade contractors alleged that the City breached its contract with them by failing to take
reasonable measures to guard against delays and disruptions by other contractors in the City's
coordination, management, and scheduling of the contractors and by failing to pay the
retainages they were due. The contractors sought damages for the delays. The City raised
three defenses: (1) the "no damages for delays" provision of the contracts; (2) untimely
notice of claims by the contractors; and (3) the contractors' acknowledgment and acceptance
of time extensions without a reservation for increased compensation in the change orders
they executed. The trial court concluded that all three of the City's defenses failed and
awarded damages to the contractors. We affirm the trial court's decisions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR.
and RICHARD H. DINKINS, JJ., joined.

William N. Bates, Gregory L. Cashion, and Craig N. Mangum, Nashville, Tennessee, for the
appellant, City of Franklin, Tennessee.

Todd E. Panther, Nashville, Tennessee, for the appellee, Lee Masonry, Inc.

Stafford F. McNamee, Jr., Brentwood, Tennessee, for the appellee, Stansell Electric
Company, Inc.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

This is a contract dispute between two trade contractors, Lee Masonry, Inc. ("LMI") and Stansell Electrical Company, Inc. ("SEC"), and the City of Franklin, Tennessee ("City"). The plaintiffs allege that the City breached its contract with them by failing to coordinate, manage, and schedule the various trade contractors on the Franklin Municipal Services Complex project by neglecting to take reasonable measures that would guard against delays and disruptions by other contractors and by failing to pay the retainages the plaintiffs were due.

LMI filed suit against the City on March 23, 2004; SEC filed suit on October 8, 2004. The City answered each suit denying the allegations and alleging that each plaintiff failed to satisfy contractual conditions precedent to obtaining any relief for delay and disruption. On November 1, 2004, the court entered an order to consolidate the two cases.[1] A six-day trial took place in March 2008. In a detailed memorandum opinion dated August 8, 2008, the court made findings of fact, which are not in dispute.

Before construction on the project began, the City paid for a geotechnical exploration into the subsurface conditions of the construction site and received a report on February 11, 2002. The report addressed numerous problems with the soil, including wet soil and soil that was unsuitable for buildings. A portion of the site was designated wetland. The site work was delayed until approximately February 1, 2003, for a permit to be issued by the EPA to allow the project to go forward. The former City Manager and the Job Superintendent for Rock City, the City's construction manager for the project, acknowledged that the location was a bad site. The trial court found that "[t]he soils were very porous, stayed wet, and there was bad soil virtually all over. The grading contractor ran into springs all over the site and french drains had to be constructed to get rid of the water."

Rock City prepared a pre-bid schedule that established dates when certain jobs would be completed on certain buildings and served as a guide for the trade contractors while they bid on the project. According to the pre-bid schedule, masonry work was to begin March 18,

---

[1]The City initially filed a third-party complaint against Rock City Construction Co., Inc., its construction manager on the project. The City alleged that because Rock City was its agent, any contractual duties that were owed to LMI or SEC that were breached by the City were a result of Rock City's performance or non-performance of its duties to the City. The City voluntarily dismissed Rock City in September 2005. The City and Rock City collaborated at trial with the City's acknowledgment that Rock City was its agent and the City was vicariously liable for everything Rock City did on the project.

2003, and be completed by June 16, 2003, while electrical work was to run from April 1, 2003, to August 22, 2003. The trial court found that "LMI and SEC based their entire forecast including bid pricing, manpower scheduling and substantial completion for this job on a Pre-bid Schedule."

The trial court discussed the collaborative nature of construction projects. On a construction site, certain jobs must be completed before others may begin. This inevitably results in certain contractors waiting for others to finish before they can begin. A major draw to contractors working on this particular project was the fact that six different structures were being built at the same time, allowing the contractors to work around each other and minimize downtime. As the trial court found, "[t]his was conveyed to the trade contractors, and LMI and SEC relied on this incentive while developing their bids."

On March 12, 2003, LMI entered into a contract with the City agreeing to perform all masonry work on the project for $271,300. On April 9, 2003, SEC entered into a contract with the City agreeing to perform all electrical work on the project for $650,000. The language of the two contracts is identical in all relevant and material aspects. Pursuant to Article 8 of the agreements, there were a number of other documents incorporated by reference, including but not limited to the Standard General Conditions of the Construction Contract ("General Conditions") and the Specifications. All of the contract documents were prepared by the City and presented to LMI and SEC on a take-it-or-leave-it-basis.

The trial court determined that paragraphs 2.9 and 6.6 of the General Conditions and section 01310 of the Specifications require LMI and SEC to abide by a construction schedule prepared by the City. According to the trial court, the documents contemplate that the City would develop a fully integrated construction schedule before work on the project began. The General Conditions state that time is of the essence of the agreement. The trial court found that LMI and SEC "reasonably relied upon the City's fulfillment of this obligation." At the time of the agreements, the only schedule that existed was the pre-bid schedule.

The first contractor scheduled to begin work was Civil Construction Company ("Civil"). Civil started on time in February 2003 but immediately encountered problems with the soil. One problem was that the soil was too porous, a problem that the geotechnical report had uncovered. Another problem that delayed the project occurred when Civil mistakenly used the wrong technique in blasting an area designated for the solid waste transfer station, resulting in "overshot" rock. Civil was forced to dig up shattered, overshot rock and fill the area with usable soil before building on the site could commence. Civil was given extra time by the City to correct the mistake, and Rock City changed the schedule. Instead of starting on the solid waste transfer station, Rock City moved all work to the training center. By this point, the project was already well behind the pre-bid schedule. On

-3-

April 13, 2003, Rock City initiated a new schedule under which the contractors started and finished at a later date, but the anticipated duration of the project was essentially the same.

After receiving its notice to proceed, SEC began work on May 18, 2003. By this time, the April 13, 2003 schedule had been replaced by an April 20, 2003 schedule, which changed the sequence of work that would be done on the project. When SEC began work, the April 20 schedule was already sixty days behind. The schedule still gave SEC 144 days to complete its work, the same amount allotted in the pre-bid schedule. Although required by article 12.1 of the SEC contract and paragraph 6.6 of the General Conditions, neither of the two revised schedules were issued through change orders.

Once Civil completed grading at the training center, the concrete contractor, Romach, began to lay the footings. The project was further delayed when Romach workers struck "prosphates" that were predicted in the geotechnical report and had to dig deeper to find firm soil. LMI finally began laying the foundation on the training center on June 2, 2003. However, because the site lacked power and water, LMI had difficulty completing its job. The site received power on July 15, 2003, and did not receive water until October 21, 2003. On July 15, 2003, Rock City issued another construction schedule without a change order. At that point, the project was ninety days behind.

Romach continued to struggle to complete its work on time. Romach had problems getting the correct blueprints, receiving materials on time, finding enough workers, and encountering rock at the site. The City gave Romach more time to do the excavation while LMI and SEC were forced to wait. The City issued another schedule on November 17, 2003, without a change order.

At trial, the City presented testimony that the weather and site conditions were the cause for most of the delays. The issue of whether it was a particularly rainy spring was sharply disputed. The trial court reached the following conclusion: "It is evident that much more of the delay and disruptions were due to the site conditions and not the weather. The City was aware of the problems with this site before the Project began; it was attempting to place six buildings . . . on a site covered with bad soils." The City granted both Civil and Romach time extensions to accomplish their work and increased their compensation for problems they encountered with the site conditions.

The City issued Change Order 1 to SEC on December 15, 2003, authorizing the payment of another $7,433.17 for five additional tasks already completed by SEC. It stated "no change" to SEC's contract time for these items but also stated that substantial completion was essentially being moved from December 15, 2003 to January 17, 2004. The City issued Change Order 2 to SEC on January 17, 2004, authorizing the payment of $16,738.28 for four

additional jobs. Simultaneously, the City's Board of Mayor and Aldermen ("BOMA"), which must approve all requests for change orders, stated that no more change orders would be accepted until the completion of the job. Change Order 2 stated "no change" to SEC's contract time but also listed the same substantial completion dates as contained in Change Order 1.[2] In its opinion, the court discussed the effect of the change orders on SEC's right to pursue extra costs:

> Mr. Stansell testified that SEC did not need extra time and that by signing the Change Orders he was not waiving any rights SEC had to pursue its extra costs. He had not asked for an extension; there was no fault on SEC's part. He acknowledged that he really did not understand it and he did not think waiving any rights was an issue. The Court agrees.

The court determined that the delays and disruptions kept LMI and SEC on the project longer than anticipated and increased both contractors' costs. The City had not paid either contractor their retainage or extra costs. On or about April 15, 2004, SEC filed a Request for Equitable Adjustment with Rock City for $183,606.16, which represented SEC's cost purely for delay. David Stansell of SEC met with John Lee, a representative of Rock City, to discuss the claim. Mr. Lee asked for more information but also said that there would be some money left at the end of the project to compensate SEC. Mr. Stansell replied that it would need to be a six-figure number.

SEC was on the project over seven months longer than it anticipated. The trial court summarized the reasons why this was the case:

> The site was not prepared and ready for SEC to perform its work. The buildings were not constructed per the schedules and SEC had to wait on its predecessor contractors . . . . SEC had to work during the winter months. SEC was required to do things it ordinarily would not do; it was required to jump around and work piece meal. . . . The mobilization, de-mobilization and re-mobilization affected the workers' efficiency. There was no continuity and no flow of the work.

---

[2]On September 14, 2004, long after the project was completed, the City issued Change Order 3 to SEC, which resulted in a decrease of $3,139.40.

The court also outlined the reasons that LMI was delayed:

> Among the factors that prevented LMI from progressing with its work were the City's failure to have a meaningful schedule in place before work began; the City's failure to force other contractors, primarily Civil and Romach, to adhere to the Schedule; the City's failure to take known subsurface conditions into account when planning the Project; the City's failure to hold contractors accountable . . . . None of these delays and disruptions were caused or contributed to by LMI, and all of the foregoing delays were within the City's control to avoid or overcome.

The court further concluded that "the magnitude of the delays and disruptions that the City allowed to occur could not have been anticipated by LMI or SEC." LMI and SEC continually contacted and notified the City and Rock City that the delays were impeding their progress and preventing them from completing work in accordance with the schedule. The trial court surmised that "[t]he City was well aware of the delays and disruptions that were occurring on the Project."

In an October 13, 2003 letter, LMI requested a time extension and fair and equitable compensation for all associated costs. Rock City directed LMI to wait to submit its detailed claim until LMI knew the amount of its claim. LMI provided the City a preliminary claim with supporting documentation dated December 23, 2003. LMI was notified via e-mail on January 28, 2004, that its claim was denied. LMI filed suit on March 23, 2004.

LMI sought damages for claims of loss of productivity (using the "measured mile" approach), extended filed overhead expenses, extended home office expenses (*Eichleay* damages), and the undisputed portion of its contract balance (retainage). SEC sought damages for claims of loss of productivity (using the "modified total cost" approach), extended general conditions costs, extended home office expenses (*Eichleay* damages), and the undisputed portion of its contract balance (retainage). Additionally, both plaintiffs claimed they were forced to incur additional fees and charges for engineers, consultants, attorneys, and other professionals in the collection of the amount due. According to paragraph 17.5 of the General Conditions, these additional expenses were recoverable.

The City raised three defenses: (1) the "no damages for delays" provisions of Article 12.4 of the General Conditions, (2) untimely notice of claims by LMI and SEC, and (3) the acknowledgment and acceptance of time extensions by LMI and SEC in the change orders they executed. The City admitted that LMI and SEC were entitled to their claims for retainage, with accrued interest.

In its August 8, 2008 memorandum opinion, the trial court concluded that all three of the City's defenses failed. The City filed this appeal.

STANDARD OF REVIEW

The relevant facts are not in dispute on appeal. We are presented with only questions of law, which are reviewed de novo, with no presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

This case turns on the interpretation of a contract between two trade contractors with the City of Franklin. The interpretation of a contract is a question of law, and therefore our review is de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). If the terms of a contract are ambiguous, a court must determine the intent of the parties as expressed in the four corners of the contract. *Rogers v. First Tenn. Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987). The parol evidence rule generally prohibits the use of extrinsic evidence to alter or contradict the plain meaning of an unambiguous written contract. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991); *Stamp v. Honest Abe Log Homes, Inc.*, 804 S.W.2d 455, 457 (Tenn. Ct. App. 1990). To aid the court's discernment of the parties' intention, however, the parol evidence rule does not prohibit the court from considering the circumstances surrounding the formation of the contract, the business to which the contract relates, and the construction placed upon the contract by the parties in carrying it out. *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000); *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); *Richland Country Club*, 832 S.W.2d at 558; *Coble Sys., Inc. v. Gifford*, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981). Moreover, any "[a]mbiguous language in a contract is construed against the drafter." *Jackson v. Miller*, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989).

ANALYSIS

On appeal, the City challenges four of the trial court's rulings: (1) that the City cannot rely on the "no damages for delay" clause, (2) that LMI's and SEC's claims for contract price increases were timely, (3) that the change orders did not have the effect of extending LMI's and SEC's time to complete their obligations without extra compensation, and (4) the award of damages.

## "No Damages for Delay" Clause

The City relies on the "no damages for delay" provision of the contract as a defense to the plaintiffs' action for damages. Paragraph 12.4 of the General Conditions states the following:

> Where CONTRACTOR is prevented from completing any part of the Work within the Contract Times (or Milestones) due to delay beyond the control of both OWNER and CONTRACTOR, an extension of the Contract Times (or Milestones) in an amount equal to the time lost due to such delay shall be CONTRACTOR's sole and exclusive remedy for such delay. In no event shall OWNER be liable to CONTRACTOR, any Subcontractor, any Supplier, any other person or organization, or to any surety for or employee or agent of any of them, for damages arising out of or resulting from (I) delays caused by or within the control of CONTRACTOR, or (ii) delays beyond the control of both parties including but not limited to fires, floods, epidemics, abnormal weather conditions, acts of God or acts or neglect by utility owners or other contractors performing other work as contemplated by Article 7.

The trial court found that LMI's and SEC's alleged waiver of the right to recover damages for delay was conditional upon the City fulfilling the following contractual obligations: a) paragraphs 2.9 and 6.6 of the General Conditions and section 01310 of the Specifications to have an integrated schedule developed before work began; b) paragraph 12.1 of the General Conditions to change the schedule only by change order; and c) paragraphs 12.3 and 12.4 of the General Conditions to timely grant LMI and SEC a time extension in an amount equal to the time lost by such delay. Because the City failed to comply with these three contractual provisions, the trial court held that the City could not rely upon the "no damages for delay" clause as a bar to LMI's and SEC's claims.

The City contends that (1) it did not breach the contracts by failing to fulfill these obligations, and (2) if it did, the trial court erred in concluding that the contractors' right to recover damages was contingent upon the City's fulfillment of these obligations. We think a discussion of these issues is unnecessary in light of the plain language of paragraph 12.4.

A plain reading of paragraph 12.4 reveals that any waiver of damages by LMI and SEC is conditional upon a number of factors, including that (1) the delay must be beyond the control of the City, (2) the City must grant the contractors an extension of time for the delay, and (3) the extension must be in an amount equal to the time lost due to such delay.

-8-

Given the trial court's factual determination of the events that caused the delays, we conclude that the delays were within the control of the City. The trial court specifically found that the delays and disruptions on the project were not the result of adverse weather conditions as the City insisted. Rather, "[t]he delays and disruptions were caused more by the City's selection of a poor, unsuitable project site, with bad soil conditions than bad weather." Additionally, the trial court found that the City directed the contractors to begin work without having an overall schedule in place and did not require contractors that encountered difficult site conditions to adhere to the schedule. The specifications outlined what the City could do when a contractor did not comply with the schedule, and instead of exercising its authority to mitigate or eliminate delays, the City took no proactive measures. Thus, because the delays were not beyond the control of the City, the City cannot rely on paragraph 12.4's "no damages for delays" clause to bar LMI's and SEC's claims.

Rather, paragraph 12.3 of the General Conditions governs delays beyond the control of the contractor, as opposed to both the contractor and owner. This provision stipulates that for such delays, contract times are to be "extended in an amount equal to the time lost due to such delay." The trial court found that the City did not comply with this obligation. Specifically, "the City neither granted LMI and SEC the time extension to which they were entitled, nor did it maintain LMI's and SEC's construction activities in the same sequence and durations as they were originally scheduled." Testimony for both contractors at trial indicated that LMI and SEC were forced to perform work in a different, more costly sequence than planned. Thus, the City breached paragraph 12.3 of the General Conditions, which does not limit damages exclusively to time extensions.

The City insists that the risks of delay caused by other contractors and the site selection were risks that were placed on LMI and SEC according to their contracts. It relies on paragraph 4.2.3 of the General Conditions, which states the following:

> If CONTRACTOR believes that any subsurface or physical condition at or contiguous to the site that is uncovered or revealed either:
>
> > . . . .
> > 4.2.3.2. is of such a nature as to require a change in the Contract Documents, or
> > 4.2.3.3. differs materially from that shown or indicated in the Contract Documents, or
> > 4.2.3.4. is of an unusual nature, and differs materially from conditions ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents; then

CONTRACTOR shall, promptly after becoming aware thereof and before further disturbing conditions affected thereby or performing any Work in connection therewith . . . , notify OWNER and ENGINEER in writing about such condition. CONTRACTOR shall not further disturb such conditions or perform any Work in connection therewith . . . until receipt of written order to do so.

Additionally, the City points to paragraph 4.2 of the Supplementary Conditions of the General Conditions:

[N]either OWNER nor ENGINEER makes any warranties or representations about any subsurface conditions that may be encountered within the scope of the Work. The CONTRACTOR shall satisfy himself of subsurface conditions that may be encountered by performing on-site inspections, core drillings, or other methods. The risk of encountering and correcting such subsurface conditions shall be borne solely by the CONTRACTOR . . . .

Thus, the City contends that the risk that site conditions would cause disruptions or delays was borne by the contractors.

The above cited provisions of the contract upon which the City relies focus on the subsurface conditions of the site. Subsurface conditions were of the utmost importance for the first contractors on the job, Civil and Romach, in completion of their grading and footing responsibilities. However, soil conditions had no direct effect on masonry and electrical work. To the extent that LMI and SEC were delayed and encountered additional expenses in completing their tasks, it was a result of the earlier contractors' difficulties with the site conditions, not their own.

The City's argument also fails to consider the fact that the City was well informed of the delays and disruptions that were occurring on the project and their cause. Written notification to the City of "disturbing conditions" was unnecessary. The City was aware of the problems with the site based on the geotechnical report it paid for before it contracted with LMI and SEC and before Rock City prepared the pre-bid schedule. Additionally, the City knew of the difficulties that the first contractors on the job encountered. Civil and Romach each caused delays and disruptions due to difficult site conditions. Both contractors were given time extensions and were paid for their extra time on the job, indicating the City's recognition that the site posed more problems than the contractors could have anticipated.

Furthermore, LMI and SEC individually notified the City of the various delays and disruptions that were impeding their ability to progress with the project and attended

-10-

regularly scheduled job site meetings with Rock City. Despite notification of these difficulties, the trial court found that "[t]he City did not take available measures to prevent and/or overcome the delays and disruptions." Around January 2004, after the City issued Change Order 2 to SEC, the City BOMA announced that no more change orders would be accepted until completion of the project. The City was clearly not interested in receiving further notifications of "disturbing conditions."

The evidence does not preponderate against the trial court's conclusion that the delays were within the control of the City. As a result, the City cannot rely on the "no damages for delay" provision of the contract.

Untimely Notice of Claims by LMI and SEC

The trial court determined that the City's untimely notice of claims defense failed for two reasons: (1) LMI and SEC gave timely notice of their claims pursuant to the Agreement, and (2) the City waived strict adherence to the notice provisions in the Agreement. The City challenges the trial court's conclusions on both grounds.

The trial court relied on paragraph 12.1 of the General Conditions in determining that LMI and SEC gave timely notice of their claims. Paragraph 12.1 requires LMI and SEC to give notice no later than thirty days "after the occurrence of the event giving rise to the claim." Thus, the trial court concluded that LMI and SEC had thirty days after the occurrence ended, not started, within which to state the general nature of their claims. On this basis, the court concluded that because of the cumulative nature of the delays and disruptions that were occurring over the course of the project, "the occurrence was on-going and did not end until LMI's and SEC's work ended."

The City correctly points out that paragraph 12.1 governs the change of contract times and not the change of contract price, which is instead governed by paragraph 11.2. Paragraph 11.2 requires LMI and SEC to give notice of their claims no later than thirty days "after the *start* of the occurrence or event giving rise to the claim" (emphasis added). The City argues that there was no notice from either LMI or SEC during the period when delays on the project were "most apparent"—April, May, June, and July of 2003.

As discussed above, the City had ample notice of the events giving rise to LMI's and SEC's claims and had even more information about the claims than the "general nature" required. Additionally, LMI and SEC were not required to provide notice of a claim until the events were sufficient to generate a claim. As the trial court noted, "It was only when these delays and disruptions [of June, July, and August 2003] were not addressed and additional delays and disruptions occurred that LMI and SEC were able to make a claim."

-11-

Paragraph 11.2 substantiates this conclusion in requiring a written statement from the claimant that the amount claimed "covers all known amounts to which the claimant is entitled as a result of said occurrence or event." It was impossible to know the extent of the damage on a project that started behind schedule and only became increasingly behind schedule. The trial court correctly concluded that it was not possible for LMI and SEC to assert, thirty days after the start of the occurrence, that the amount claimed was all the money they believed they were due.

Further, even if LMI and SEC did not fully comply with all of the notice provisions, such non-compliance would not be a material deviation from the contract requirements. We agree with the trial court's assessment that, based on meeting minutes, daily reports, revised schedules, and default letters to Romach, the City had actual knowledge of the delays and disruptions on the project and how they were impacting LMI and SEC. As the trial court noted, "[a]ny further written notice would not have served any practical purpose."

Additionally, we agree with the trial court's conclusion that the City materially breached the contract first. "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach." *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) (citations omitted). The trial court found that "the City materially breached the contract first, both before and when the BOMA got involved, and any obligation of LMI and SEC to give notice was a later material breach."

We agree with the trial court that the City's failure to issue new schedules properly constituted a material breach.[3] The City failed to issue a fully integrated schedule before

---

[3] The relevant factors for determination of what constitutes a material breach include the following:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

(continued...)

construction began as required by paragraphs 2.9 and 6.6 of the General Conditions and issued four revised schedules without change orders as required by paragraph 12.1. These breaches preceded any failure of LMI or SEC to give notice and were of sufficient magnitude to justify LMI's and SEC's failure to continue and complete its performance of the contract. Thus, any failure by LMI and SEC to fully perform their contractual obligations should not prevent them from seeking damages from the City.

The City also challenges the trial court's finding that it waived strict adherence to the written notice provisions of the contract through its conduct and course of dealings with LMI and SEC. The court found that "the delays and disruptions were occurring in June, July, and August of 2003, after LMI and SEC brought them to the City's attention." The court concluded that both LMI and SEC relied upon the City's promises that the delays and disruptions would be overcome and that the City would bring the schedule under control.

This court has previously noted that written change order provisions in construction contracts may be waived by the parties:

> The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection.

> The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement and that adherence to such a requirement would serve no useful purpose.

*Vakili v. Hawkersmith*, No. M2000-01402-COA-R3-CV, 2001 WL 1173285, at *6 (Tenn. Ct. App. Oct. 5, 2001) (citations omitted).

Particularly instructive on this issue is *Moore Constr. Co., Inc. v. Clarksville Department of Electricity*, 707 S.W.2d 1 (Tenn. Ct. App. 1985). In *Moore*, the Court of Appeals reversed the trial court's ruling that a contractor could not recover because it failed to prepare or submit a written change order in a manner required by the contract. Instead, the court concluded that the owner waived its right to rely on the written change order

---

[3](...continued)
*McClain*, 806 S.W.2d at 198 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241).

provision by its own conduct on the job related to delays in completion. *Id.* at 13. The court noted that "a contractor whose performance is delayed through no fault of its own [usually] has two types of relief available"—an extension of the time available for performance and a right to be compensated for the increased costs it has incurred as a result of the delay. *Id.* "[C]onstruction delays have consequences that are quickly translated into time and money, and in certain situations a contractor whose performance is delayed unreasonably is entitled to both an extension of time and damages." *Id.*

In *Moore*, as in the present case, "[t]here is no question that all parties knew that [the contractor] was being prevented from completing its work because of construction delays being experienced by [another contractor]." *Id.* The court concluded that, when the owner extended the time of completion through a means other than change order, the contractor "could have presumed legitimately that the [owner] was not going to insist on further written notice with regard to the delay because it had acknowledged that the delay had occurred and had granted the company extra time." *Id.* In sum, "[i]f the [owner] did not require a change order to grant extra time, it should not be permitted to require a change order for extra costs resulting from the same delay." *Id.* at 13-14.

The City argues that in the present case, unlike *Moore*, there was no detrimental reliance by LMI and SEC because they "were never led to believe that time extensions would be granted by any means other than Change Order." However, it was clear from the outset that adherence to the construction schedule was not possible. The project was behind before LMI or SEC began construction, and the City issued several revised schedules without change orders. The trial court noted the effect of the City's failure to comply with the change order requirement:

> The provisions of the General Conditions interrelate to one another in such a way that the City's failure to issue proposed Change Orders with its various schedules excused LMI and SEC from having to strictly comply with the notice provisions in the Contract Documents. Had the City submitted a proposed Change Order with its schedules, it would have given LMI and SEC the opportunity to calculate the increased cost associated with having to follow each schedule, and then if the City disagreed, give written notice of a claim. The City's failure to submit proposed Change Orders when it issued its various schedules resulted in the City by-passing the contractual procedures which would have led to written notice of a claim.

Additionally, shortly after the two change orders that were issued by the City to SEC, the City announced that no more change orders would be accepted until the completion of

the project. Not surprisingly, this affected the filing of claims by the contractors; SEC did not submit any further change orders.

It is clear that the City had knowledge throughout the period that LMI and SEC were being delayed through no fault of their own, and the City undoubtedly knew that the delays could prove costly to the contractors. As a result, it was reasonable for both contractors to conclude that the City had consciously decided that formal adherence to the written notice requirements with regard to the delays was no longer necessary. We agree with the trial court's conclusion that LMI's and SEC's claims for price increases were timely.

<u>Acknowledgment and Acceptance of Time Extensions
in LMI's and SEC's Change Orders</u>

The City argues that the change orders it executed had the effect of giving LMI and SEC extra days to complete their obligations without any reservation for being compensated for the extension. The contractors, on the other hand, insist that they did not waive their right to damages by failing to indicate a reservation of rights when they signed the change orders.

The City first contests the trial court's determination that it could not interpret the City's change order according to its plain terms because it is "confusing" and the terms are "not plain." The City also challenges the court's finding that it was understandable for LMI and SEC to not know what effect, if any, the change orders would carry since they were told that the City would not approve any more change orders until the project was complete.

The City instead asserts that the "clear and unambiguous" language of the change orders constituted an accord and satisfaction between the parties, an acceptance of something other than what was originally due in settlement of an existing claim. The City relies on *John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24 (1991), as support for its proposition. "A party claiming an accord and satisfaction must show 'proper subject matter, competent parties, meeting of the minds of the parties, and consideration.'" *Id.* at 29 (quoting *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965)).

In the instant action, the trial court found that there never existed a meeting of the minds of the parties because LMI and SEC did not know what effect, if any, an executed change order would carry since the project was perpetually behind schedule and the City, via the BOMA, stated its intention not to follow the change order policy as stipulated in the contract documents. The conclusion that the change orders did not represent a meeting of the minds between the parties is substantiated by the discussion that City officials had with SEC representatives. Rock City's representative indicated that there would be some money left at the end of the project to compensate SEC.

Additionally, *Massman* is distinguishable from the present case on the basis of the language used in the change orders. The *Massman* change orders specified that "[t]his modification constitutes *compensation in full* on behalf of the contractor . . . for all costs and markups directly or indirectly attributable to the changes ordered herein, for all delays related thereto, and for full performance of the changes within the time stated." *Id.* at 29 (emphasis added). No language expressly limiting LMI's and SEC's rights to recover is present in the change orders now at issue.

Damages

The court determined that the preponderance of the evidence established that the City's breach caused both LMI and SEC damages to which they are entitled. The court awarded both contractors damages for loss of productivity, extended filed overhead expenses, and professional fees, but it denied the contractors *Eichleay*[4] damages for unabsorbed overhead.[5] Combining damages and professional fees, LMI was awarded a judgment in the amount of $429,110.22 and SEC was awarded a judgment in the amount of $678,845.11. The City challenges the trial court's award of any damages to LMI and SEC and specifically challenges the methods that LMI and SEC used to calculate loss of productivity damages.

Tennessee law permits the recovery of all damages that are the normal and forseeable result of a breach of contract. *Bush v. Cathey*, 598 S.W.2d 777, 783 (Tenn. Ct. App. 1979). Uncertain, contingent, or speculative damages should not be awarded. *Maple Manor Hotel, Inc. v. Metro. Gov't of Nashville & Davidson County*, 543 S.W.2d 593, 599 (Tenn. Ct. App. 1975). Courts will allow damages for breach of contract even where it is impossible to prove the exact amount of damages. *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928). All that is required is proof with a reasonable degree of certainty. *Buice v. Scruggs Equip. Co.*, 267 S.W.2d 119, 125-26 (Tenn. Ct. App. 1953).

In the context of a construction project, "it is reasonably foreseeable that a contractor whose ability to complete its work is impaired by the owner and whose performance is

---

[4] *Eichleay Corp.*, ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688 (1960).

[5] Both LMI and SEC claimed damages according to the *Eichleay* formula, which is "the only means approved in our case law for calculating recovery for unabsorbed home office overhead." *Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1374-75 (Fed. Cir. 1999). The *Eichleay* formula is used to "equitably determine allocation of unabsorbed overhead to allow fair compensation of a contractor for government delay." *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1578 (Fed. Cir. 1994). In the present case, the trial court concluded that the contractors failed to meet the three-prong test to qualify for *Eichleay* damages and that damages of this type are specifically excluded by the parties' contract. *See Nicon, Inc. v. United States*, 331 F.3d 878, 883 (Fed. Cir. 2003). Neither contractor appealed the trial court's denial of *Eichleay* damages.

thereby substantially delayed will suffer direct damages and that the extent of these damages will depend upon the unique facts of each case." *Moore*, 707 S.W.2d at 15. Such damages can include increased payroll and labor costs, increased material costs, loss of efficiency of the use of equipment, extended bonding and insurance coverage, and overhead items. *Id.*

The City asserts that the trial court erred in awarding any damages due to the actions of other contractors, poor site conditions, or failure to have an integrated schedule. First, the City insists that to the extent that other contractors, such as Romach and Civil, caused delays, LMI's and SEC's remedy was to bring an action against those contractors. The City relies on paragraph 12.4 of the General Conditions for this premise:

> In no event shall OWNER be liable to CONTRACTOR . . . for damages arising out of or resulting from (I) delays caused by or within the control of CONTRACTOR, or (ii) delays beyond the control of both parties including but not limited to fires, floods, epidemics, abnormal weather conditions, acts of God or acts or neglect by utility owners or other contractors performing other works as contemplated by Article 7.

As discussed above, we agree with the trial court's conclusion that the delays were within the control of the City. Thus, the City cannot rely on paragraph 12.4's "no damages for delay" provision.

Next, the City claims that because the contract placed the risk of poor site conditions on LMI and SEC, the contractors should not be able to recover damages that resulted from poor site conditions. This argument also fails for the same reasons it did when the City attempted to rely on the "no damages for delays" clause. The provisions of the contract the City relies upon in its argument require the contractors to notify the City of any "disturbing conditions." From the beginning of the project until its completion, the City was well informed of the delays and disruptions that were occurring on the project and their cause. Written notification as required under the clauses that the City now insists "place[] the risk of poor site conditions upon LMI and SEC" was unnecessary.

Finally, the City insists that LMI and SEC should not have been awarded damages for the City's failure to have an integrated schedule because no such requirement existed in the contract documents. The City is correct that there was no contractual requirement that the City issue an integrated schedule before construction began. However, the City did create a schedule upon which bids were based, and the City failed to adhere to and enforce the integrated schedule it established. It was not the failure to have a schedule that caused LMI and SEC damage; it was the failure to follow the schedule that was implemented. Additionally, as discussed above, the City breached other provisions of the contract—namely, it failed to issue change orders for its numerous revised schedules.

-17-

Tennessee law permits the recovery of all damages that are the normal and forseeable result of a breach of contract, as long as they can be proven with a reasonable degree of certainty. Given the abundance of evidence the contractors presented in support of their damages, the evidence does not preponderate against the trial court's findings.

The City also specifically contests LMI's and SEC's calculation of loss of productivity damages. LMI used the "measured mile" approach to reach its amount of loss of productivity damages, and SEC used the "modified total cost" approach. The court found both approaches reasonable and determined that both contractors were entitled to these damages as established by the proof at trial.

The City argues that the modified total cost method used by SEC is "highly disfavored and used only as a last resort when there is no other feasible method of calculation because it carries the double-edged risk of bidding inaccuracies reducing the estimated cost and performance inefficiencies inflating the actual cost." No Tennessee case law directly stands for this proposition. The case law that the City cites in support of its position actually states that while the total cost method, whereby the measure of damages is the difference between the actual cost of the contract and the contractor's bid, is viewed with disfavor, "[t]he modified total cost methodology addresses some of the objections to the total cost method." *Raytheon Co. v. White*, 305 F.3d 1354, 1365 (Fed. Cir. 2002). Additionally, the total cost method is appropriate when "no other method [is] feasible" and "the supporting evidence [is] substantial." *Moorhead Constr. Co., Inc. v. City of Grand Forks*, 508 F.2d 1008, 1016 (8th Cir. 1975).

Under either the total cost or the modified total cost methodology, the contractor must prove "(1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing *WRB Corp. v. United States*, 183 Ct. Cl. 409, 426 (1968)). At trial, SEC's expert, Richard Englehart, explained that the modified total cost method was the only feasible method of calculating damages:

Q: Is there a—both the modifying the total cost thing, is that an accepted method of determining damages where the conditions are such as they were at this site?
A: Given the conditions and the parameters that—that I reviewed in order to substantiate this type of claim, yes.
Q: Is there any other way you could have computed the extra costs that Stansell incurred other than this method?
A: On this project?
Q: On this project.

A: No. There is no other way to have done it.

Q: And why is that?

A: To a reasonable degree of certainty, there's no other way to do it. Based upon that pervasive nature of those conditions that we talked about, the constant uncertainty and the project record and the documentation. In order—as far as the scheduling information that was available, the day to day—daily information about where each contractor—not just Stansell, but where each contractor was, did not allow for that type of study to be done.

Given the evidence presented at trial, we conclude that SEC met the four-part test and that the modified total cost method for determining SEC's damages was appropriate.

The City also challenges LMI's use of the "measured mile" approach to reach its amount of loss of productivity damages. The measured mile analysis is "a method of calculating losses related to productivity by comparing the construction progress during a 'problem' period on the job with such progress during a similar unimpacted time period." *Alstom Power, Inc. v. RMF Indus. Contracting, Inc.*, Nos. 2:03cv627, 2:03cv1050, 2006 WL 3839235, at *2 (W.D. Pa. Dec. 29, 2006). The City accuses LMI of calculating its unimpacted time during its most productive days, which it claims is contrary to the daily reports. The City insists that Bob Lee, the president of LMI, changed the days designated as unimpacted between his first and second reports in order to maximize LMI's damages.

Mr. Lee explained the Production Impact Report for block, brick, and grouting activities to the court at trial:

A: Well, on the right-hand side what we have are what's called unimpacted. By unimpacted, days at which we felt like we had enough room for work that particular day, didn't have lack of steel rentals or some other items impacting us so that we couldn't do it.

. . .

Q: Again, comparing the left column and the right column, what are you trying to gain a picture of?

A: Of how we were doing when we didn't have all of the problems that we ended up having on this project versus how our labor costs were when we had problems on the project. And quite honestly, you know, it was hard to find unimpacted work on this project. It was just unbelievable.

Later, during cross-examination, Mr. Lee testified, "I would state that almost every single day on that project was impacted."

Mr. Lee admitted at trial that LMI made a mistake in assessing days in the first report, but nothing in the record suggests that LMI or Mr. Lee purposefully manipulated the unimpacted days. Mr. Lee was questioned on the matter during cross-examination:

Q: Now, when I look at the impacted versus unimpacted, you didn't just run these numbers and pick the five best, did you?
A: I did not do that.

Mr. Lee also discussed the complexity of assessing unimpacted and impacted days for its various tasks:

[Y]ou might have had a good day on block and you were having a bad day on brick. You might have had a good day on grouting, and the reason you would have that is because you might be being impacted. As you can see, you're working on multiple areas, so it does become a little bit more complicated than that.

This court gives great weight to a trial court's factual findings that rest on determinations of credibility. *See, e.g.*, *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Given the difficulty LMI encountered in finding unimpacted days on which to base its analysis and this court's deference to the trial court on factual findings, we conclude that LMI proved its loss of productivity damages within a reasonable degree of certainty.

Finally, LMI claims the trial court erred by denying it prejudgment interest on the fees and expenses it paid to pursue its claim. In its memorandum opinion, the trial court ruled that LMI was entitled to recover "prejudgment interest at a rate of 8% from February 17, 2004." In its final order of judgment dated November 21, 2009, the court awarded LMI prejudgment interest of $49,370.59. LMI argues that "there is no practical difference between interest on the amount of LMI's *damages* and interest on the amount of LMI's *expenses*" (emphasis added). Both, LMI claims, are needed to make it whole.

LMI claims that the terms of its contract with the City treat fees and expenses spent to pursue a claim the same way as damages. Thus, prejudgment interest should be awarded on damages as well as fees and expenses. LMI relies on paragraph 17.5 of the General Conditions for its assertion: "Whenever reference is made to 'claims, costs, losses and damages,' it shall include in each case, but not be limited to, all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs."

Tenn. Code Ann. § 47-14-123 authorizes the award of prejudgment interest. It defines prejudgment interest as "interest as an element of, or in the nature of, damages" and

stipulates that it "may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Additionally, "[t]he common-law power to award prejudgment interest has consistently been viewed as an equitable matter entrusted to the judge's discretion. Accordingly, Tenn. Code Ann. § 47-14-123 has been construed to preserve the discretionary character of these decisions." *Scholz v. S.B. Intern, Inc.*, 40 S.W.3d 78, 81 (Tenn. Ct. App. 2000).

The contractual provision that LMI cites is not specific as to prejudgment interest. LMI has offered no support for its conclusion that we should modify or supplement the trial court's discretionary award of prejudgment interest on damages.

The decision of the trial court is affirmed. Costs of this appeal are assessed against the appellant, for which execution may issue if necessary.

 

 

_____
ANDY D. BENNETT, JUDGE